**UNITED STATES of America, Appellee,**

v.

**William MARTIN, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**James REKRUT, Defendant, Appellant.**

Nos. 85–1985, 86–1152, 86–1072 and 86–1073.

United States Court of Appeals, First Circuit.

Argued Sept. 11, 1986.

Decided April 6, 1987.

**820**

John A. MacFadyen, Providence, R.I., for William Martin.

Neil P. Philbin, with whom Kirshenbaum & Kirshenbaum, Cranston, R.I., was on brief, for James Rekrut.

Maury S. Epner, Washington, D.C., with whom Lincoln C. Almond, U.S. Atty., Robert D. Krause, Asst. U.S. Atty., Providence, R.I., and Patty Merkamp Stemler, Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before CAMPBELL, Chief Judge, WISDOM,[*] Senior Circuit Judge, and COFFIN, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

Appellants Martin and Rekrut, together with four others, Cortellesso, Speakman, Carnevale and Galligan, were indicted by a federal grand jury on counts charging interstate transportation of stolen motor vehicles, the sale and concealment of stolen motor vehicles, the interstate transportation of falsely made securities (*i.e.,* certificates of title), and conspiracy, in violation of 18 U.S.C. §§ 2312, 2313, 2314 and 371 (1982). When brought before the district court, Carnevale was acquitted. Cortellesso, Speakman and Galligan pled guilty to several counts with the balance of the charges being dismissed. Cortellesso and Speakman entered into a plea agreement, agreeing to cooperate with the government; they both testified against Martin and Rekrut at trial. Martin was convicted on 41 counts that included violations of each of the previously cited sections. Rekrut was convicted on one count of interstate transportation of a falsely made security under 18 U.S.C. § 2314. Martin and Rekrut now appeal. We affirm Martin's conviction, but reverse Rekrut's.

The facts, viewed in a light most favorable to the government, include the following. In 1978 Cortellesso decided to sell repaired used cars. Needing a license to do so, he paid Lionel Belanger of Pershing Auto Sales $200 per month to use two of Pershing's dealer plates.[1] Several months later Cortellesso originated the scheme through which Martin purchased a wrecked car from an insurance company, procured a duplicate title for the car, eliminated from the chain of title all reference to the insurance company as a past owner, and forged the signature of the last owner of the car in the assignment block. Galligan stole a

---

[*] Of the Fifth Circuit, sitting by designation.

**1.** In early 1981 Lionel Belanger changed the name of his business from Pershing to Belanger Auto Sales, and Cortellesso then continued selling the cars under the Belanger name.

car that matched the wreck, as closely as possible in color, model, year, engine size and number of doors, and delivered it to Cortellesso. Cortellesso and Speakman then removed all the vehicle identification numbers from the wrecked car and transferred them to the stolen car. In addition, the locks of the stolen car were exchanged, the odometer was reset, and the stolen car was cleaned and prepared for sale.

Martin was then in charge of transporting the retagged cars to the Northway Auction in Albany, New York, and selling the cars there to dealers. For this job he used various people including Carnevale and Rekrut. The latter two drove at least some of the cars to the auction, helped sell the cars there, and filled in the Pershing/Belanger name on title papers which they turned over to dealer-purchasers.

We will turn first to the issues raised by Martin.

### I.  MARTIN

#### A.  *Admission of the Plea Agreements*

■ Martin claims it was error for the court to allow the government to read to the jury the full contents of Cortellesso's and Speakman's plea agreements. These included a provision that the witness will be exposed to prosecution for perjury if he gives false information or false testimony. Martin argues that for the prosecutor to present such provisions to the jury, unredacted, amounts to improper vouching for the credibility of the witness. Martin contends that "[t]his language suggested, inaccurately, that the Government was carefully monitoring the veracity of this witness." He adds that the contingent nature of the benefits accorded Cortellesso and Speakman provided an inducement for these witnesses to testify falsely.

We do not agree that informing the jury of the contents of a plea agreement of, at least, normal stripe is error. Martin relies upon *United States v. Roberts*, 618 F.2d 530 (9th Cir.1980), a case markedly different from this (the prosecutor told the jury that a police officer had been monitoring the witness's testimony). The Ninth Circuit commented on the side,

A trial court should be alert to the problem of vouching before admitting a plea agreement containing a promise to testify truthfully. The court should consider the phrasing and content of the promise to ascertain its implications and decide whether an instruction to the jury would dispel any improper suggestions.

*Id.* at 536. In the present case, a cautionary instruction was given.

Recent circuit opinions have held that the admission into evidence of plea agreements "does not constitute impermissible bolstering of the witness's credibility." *United States v. Townsend*, 796 F.2d 158, 163 (6th Cir.1986). *See, e.g., United States v. Binker*, 795 F.2d 1218, 1223 (5th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987); *United States v. Dennis*, 786 F.2d 1029, 1046–47 (11th Cir.1986). Such agreements may often, as in the present case, point in different directions: a warning therein that the defendant will be prosecuted for false testimony enhances his credibility as a witness, but the rewards promised to him in the same document may undermine his credibility by showing that he stood to gain from incriminating others. *Townsend*, 796 F.2d at 163. As the district court noted, redaction would leave the jury with a slanted and false picture of what the bargain entailed. Only by viewing the entire agreement can the jury get the whole picture, from which to assess, as best it can, the probable motives or interests the witnesses could have in testifying truthfully or falsely.

■ Martin argues that, in any event, remarks made by the prosecutor in the redirect examination of Cortellesso and during rebuttal argument, constituted improper vouching for the witness's credibility. But we do not believe the prosecutor here portrayed himself "as a guarantor of truthfulness." *Roberts*, 618 F.2d at 537. The Eleventh Circuit has said that improper vouching may occur in two ways:

First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. Secondly,

a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.

*United States v. Sims*, 719 F.2d 375, 377 (11th Cir.1983), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984) (citations omitted).

Neither sort of impropriety took place here. At the end of his redirect examination of Cortellesso, the prosecutor said,

Q. The plea agreement requires you to testify truthfully, is that correct?

A. Yes, sir.

Q. Have you told the truth to this jury as best you recall and recollect, sir?

MR. BUTTERFIELD: Objection.

THE COURT: Sustained.

MR. KRAUSE: Thank you, Mr. Cortellesso, no further questions.

Then, in his rebuttal at closing argument the prosecutor said,

The plea agreement that Mr. Butterfield says was such a deal. Each one of those individuals, Speakman, Cortellesso expect to go to jail. The plea agreements are in evidence, you can look at them. The Government is going to recommend substantial jail, the maximum penalty is five years, and even with good time off, five years, four years in a Federal Penitentiary, that's no walk in the park. If the agreement was that they would be immunized from all prosecution, if they were to get straight probation and go about their business for the next several years, sure, you could say this stinks, something's rotten here. That's not the deal. The deal is that they are fully expected to go to jail. No immunity, no probation on that first count of conspiracy. In the final analysis of course it's up to the judge as to what happens but they all both expect to go to jail, and the Government is going to recommend that they go to jail.

There's another clause in that plea agreement that says if they lie, they're in bigger trouble than they were when they walked into this courtroom because that's called perjury. And you decide whether they would risk that on top of everything else they had to risk. And the fact that the second count carries with it something other than jail, doesn't mean it's a light count because the judge can do pretty much what he wants with that count except jail. Probation, restitution for the next five years after Speakman and Cortellesso finish the first sentence. If they so much as drive with a suspended license, they're looking at another five years in the Federal Penitentiary. This is no walk in the park, this is no sweet deal. These people are going to jail and they came here and they told you the truth.

While we disapprove of the last quoted phrase ("they told you the truth"), the rest of these remarks, taken in context, were not improper. To say the plea agreement, already in evidence, required Cortellesso to tell the truth was not a personal assurance by the prosecutor that Cortellesso had indeed told the truth. The point was made, moreover, only "after the defense had cross-examined the witness[es Cortellesso and Speakman] about the agreement in a manner that utilized the agreement to challenge the witness' credibility." *Binker*, 795 F.2d at 1223.

By the same token, the prosecutor's comments during rebuttal came only after, and in response to, the defense's discussion of the plea agreements in its own closing argument. The defense had argued that the agreements manifested the witnesses' motivation to fabricate. The Fifth Circuit has said in a similar situation,

Typically, the fact that a government witness has made a plea bargain with respect to the events at issue is a matter which the defense desires to heavily emphasize as adversely affecting the witness' credibility, giving him an ulterior motive to falsely implicate the defendant. If the terms of the plea bargain are proper, ... then certainly it is appropriate for the government to *respond* by asserting that the agreement provides an incentive to tell the truth rather than to lie. Nor is it reasonable that the government be made to appear as if it were hiding the plea agreement or its terms by

being prevented from mentioning them until they are first brought out by the defense, at least assuming that the defense does not waive the right to bring those matters out. Normally, if the agreement is gone into, all proper terms relevant to the witness' motive may be disclosed.

*Binker,* 795 F.2d at 1225.

We hold that the government's comments regarding the plea agreement did not constitute an improper vouching for the witnesses' credibility. The prosecutor did not "place the prestige of the government behind the witness" nor indicate that "information not presented to the jury supports the testimony." *Sims,* 719 F.2d at 377.

█ We have already indicated that we think the prosecutor's concluding flourish during rebuttal ("they told you the truth") was improper. Literally this was vouching, although it can also be taken in context simply as rhetoric. However construed, it was the sort of borderline lapse which, at most, amounted to harmless error.

### B. *The Willful Blindness Instruction*

Martin argues that the court erred in giving the jury an instruction on willful blindness because the government produced no evidence that he deliberately avoided knowledge of the illegal scheme.

█ In *United States v. Picciandra,* 788 F.2d 39, 46 (1st Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986), we said that a willful blindness instruction is appropriate when (1) defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood by a juror as mandating such an inference.

The first part of this inquiry is plainly met in this case. Martin has all along claimed that Cortellesso and Speakman erred in testifying that Martin was aware of the fraudulent scheme.

█ As to the second part of the *Picciandra* test, whether the facts suggested a conscious course of deliberate ignorance depended upon whether the jury believed Cortellesso's and Speakman's testimony that Martin was aware of the criminal scheme. If the jury believed them, deliberate ignorance was irrelevant, since Martin was then not ignorant but fully knowledgeable. In such event, an instruction on willful blindness was redundant but surely not harmful. The jury may, however, have disbelieved Cortellesso and Speakman. Martin contended that the two men were lying, insisting that their deal with the government motivated them to implicate him. If the jury accepted this argument, the remaining evidence was sufficient to show that Martin knew the cars were probably stolen and yet consciously followed a course of calculated ignorance. There was evidence that Martin had vast experience in the business of buying and selling cars, that he was buying salvage vehicles for Cortellesso and was selling them at an auction in upstate New York, that he was receiving duplicate titles through the mail and using them to sell the cars, that Martin and his men were selling the cars under the Pershing/Belanger name without authorization, that he had continuous contact with Cortellesso, and that he failed to show an auctioneer from Northway who came to Rhode Island the "reconditioning shop" where Martin said he picked up most of the cars. Given this and other evidence, and assuming the jury disbelieved Cortellesso and Speakman, they might still conclude that, although aware of the probability of wrongdoing, Martin had deliberately blinded himself by refusing to take the most elementary investigatory steps. *United States v. Rothrock,* 806 F.2d 318, 323 (1st Cir.1986). We think this was a sufficiently plausible construction of the evidence for the court to have given a willful blindness instruction.

█ The last part of the *Picciandra* test is whether the court's instruction, taken as a whole, cannot be misunderstood by a juror as mandating an inference of willful blindness. This element causes no difficulty here. The court made it clear that it was up to the jury to find whether there was "willful disregard or deliberate closing

of the eyes" and to draw the inference it deemed fit. The court did not suggest that the jury was in any way obliged to make adverse findings or inferences. The court further cautioned the jury "that a showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge or deliberate disregard."

Martin argues that even if the district court were correct in giving a willful blindness instruction, it should have included in it a caveat that in the event the jury found Martin deliberately avoided knowledge, he should not be convicted if he subjectively disbelieved that he was contributing to criminal activity. We need not address whether this particular caveat should have been added upon request, since Martin did not request any such instruction at the trial, nor did he object to the court's failure to give it. *See United States v. Krowen,* 809 F.2d 144, 150 (1st Cir.1987). Without this unrequested addition, the instruction given by the court did not constitute plain error.

### C. *Denial of Motion for New Trial Based on Newly Discovered Evidence*

Martin contends the court erred in denying his motion for a new trial based on alleged new evidence. The evidence upon which Martin based his motion was a confession by codefendant Galligan and two other affidavits.

■ We have said that a motion for new trial on the basis of newly discovered evidence will ordinarily not be granted unless the moving party can demonstrate that

(1) the evidence was unknown or unavailable to the defendant at the time of the trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant.

*United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980).

■ The district court found that none of these elements had been shown. As to

Galligan's confession, the evidence defendant suggests was most compelling in his favor, the court said that "there is nothing in the ... confession which creates a reasonable doubt of Martin's guilt that would not otherwise have existed"; "[t]o the contrary, the confession is wholly inculpatory as to Mr. Martin's guilt." The court explained extensively why it believed none of the "new" evidence warranted a new trial. We have examined this evidence and do not perceive any abuse of discretion in the ruling of the district court. "Ordinarily we will affirm the trial court's denial of a new trial unless the court has manifestly abused its discretion; the court's findings of fact will not be overturned unless they are without any support in the record." *Wright,* 625 F.2d at 1019.

Martin also contends the district court erred both in failing to give an adequate accomplice instruction and in its definition of "reasonable doubt." Martin did not object on these grounds to the court's instructions as given. Thus only if these matters constituted plain error would we consider them reversible error on appeal. The court's instructions as given were sufficient to obviate any issue of plain error.

### II. REKRUT

Rekrut argues that the district court erred when it refused to allow his motion for a judgment of acquittal. He says the evidence was insufficient, as a matter of law, to permit a rational jury to find him guilty beyond a reasonable doubt.

The sole count under which he was convicted, Count 57, read as follows:

On or about August 20, 1981, in the District of Rhode Island and elsewhere, and in furtherance of the conspiracy charged in Count 1 of this indictment, defendants ARMAND CORTELLESSO, a/k/a "SMOKEY" CORTELLESSO; NICHOLAS A. SPEAKMAN; WILLIAM H. MARTIN, JR.; JAMES REKRUT; GENEROSO CARNEVALE, JR.; and JAMES GALLIGAN, with unlawful and fraudulent intent, did transport and cause to be transported in interstate commerce, from the State of Rhode Island to

the State of New York, falsely made, forged and altered securities; namely, Massachusetts duplicate Certificate of Title No. P707941 and a Rhode Island Dealer's Reassignment of Title relating to said Massachusetts duplicate Certificate of Title No. P707941, knowing the same to have been falsely made, forged and altered.

In violation of Title 18, United States Code, Sections 2314 and 2.

■ For the jury to have convicted Rekrut as an aider and abettor under 18 U.S.C. § 2, it had to be shown that he

in some way "associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." Participation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that result.

*United States v. Hathaway,* 534 F.2d 386, 399 (1st Cir.1976) (citations omitted). Thus it was not necessary to prove that Rekrut personally transported the falsely made, forged and altered certificate of title from Rhode Island to New York. It would be enough to show that he *knowingly* associated himself with a criminal scheme to do so.

The evidence amply established that the certificate of title specified in Count 57 had been altered and forged, that it had been transported in interstate commerce, that Rekrut filled in the Belanger name on the certificate as assignee of the vehicle and was present at the time the stolen car was sold at the Northway Auction in Albany, New York. What is in doubt is whether the evidence sufficiently shows that Rekrut was aware of the fraudulent nature of the certificate. Rekrut insists that merely selling cars for Martin at the Northway Auction—a legitimate enterprise—does not show he knew the cars were stolen and their papers, which he handled, forged. According to Rekrut, the government failed to present facts from which the jury could determine beyond a reasonable doubt

that he was aware of the criminal nature of the sale in which he participated.

In arguing that there was sufficient evidence to establish knowledge, the government relies on the following:

(1) Rekrut had extensive experience in the automobile business;

(2) Despite his working for Martin, d/b/a Miracle Auto Sales, Rekrut inserted the name of Belanger, a dealership for which he did not work, as assignee on title certificates he gave out at the Northway Auction covering vehicles sold for Martin;

(3) There was evidence from which it could be inferred that the certificates of title relating to the approximately 100 vehicles Rekrut sold for Martin were all duplicates, rather than original certificates, a fact, it is said, that would have aroused Rekrut's suspicion;

(4) The events with which Count 57 are concerned came at the end of Rekrut's two-to three-year association with Martin;

(5) Rekrut's fingerprints and handwriting were identified on the certificate of title in question;

(6) All the cars Rekrut was involved in selling for Martin at the Northway Auction, Albany, New York, came from Rhode Island, a four-hour journey to the site of the auction. No other Rhode Island cars were sold at Northway;

(7) Rekrut was present when the car to which the title in Count 57 refers was sold at Northway;

(8) Rekrut made an exculpatory statement which the jury could have found to have been false, when he told an insurance representative that he, Rekrut, had never transported vehicles to the auction.

Basing its determination on the above evidence, the district court found sufficient proof that Rekrut knew he was aiding and abetting a criminal scheme. The court having given a willful blindness instruction, we shall consider whether the evidence showed either that Rekrut knew of the falsity of the title document or else knew its falsity was so probable that his failure to inquire further amounted to willfully blinding him-

self. *United States v. Rothrock*, 806 F.2d at 323.

We find this a close and difficult question. The very fact that Rekrut, working for Martin for a period of some two or three years, helped sell about 100 stolen cars at auction would certainly, on its face, suggest a strong possibility that he knew what was going on. Nonetheless, this fact alone would not suffice to prove beyond a reasonable doubt that he was in on the scheme. It is possible that a crooked dealer would not tell his salesmen the cars were stolen. Rekrut's activities were apparently limited to selling cars for Martin at the Northway Auction in Albany, New York (plus driving cars there with a partner, to some unspecified degree). The vehicles came through with ostensibly legitimate title certificates. Rekrut would fill in the name of a dealer, Belanger, as assignee; there was some evidence that the last minute insertion of an assignee's name by the salesman is a not uncommon practice. No evidence was presented that Rekrut was involved in the stealing of cars or the forging of the papers.

The government contends that there were certain factors which would have told an experienced used car salesman, such as Rekrut, that the vehicles he was helping sell were likely stolen and hence their title certificates were forged. Thus the government stresses that the title certificates being provided by Martin were all duplicates—a fact, according to the government, that would have alerted an experienced salesman to the illegal source of the cars. Also suspicious, says the government, was the fact that Martin was marketing his cars in Albany, New York, a four-hour drive from Rhode Island where Martin received them. And the government also argues it was odd that Martin told Rekrut to insert Belanger's name as assignee rather than his own.

The trouble with these factors is that persons not experienced in marketing used cars cannot tell what to make of them. A lay person cannot say with assurance, for example, that it is unusual to market used cars with duplicate certificates of title.

While there was expert testimony at trial that duplicate certificates are often used to facilitate schemes of this nature, by eliminating the name of an insurance company from the chain of title, there was no testimony that duplicates are not also commonly used for legitimate ends. For all we know, duplicate certificates may often be used. Hence it is not clear what an experienced salesman like Rekrut would have made from the fact that Martin's vehicles came through with duplicates. Similarly, there could be legitimate reasons, such as higher prices, for marketing used cars at a dealers' auction such as Northway that is four hours distant from the place where the cars had been located. While there was evidence that Martin's cars were the only ones from Rhode Island, there was no evidence as to how many other cars were there from similarly distant places. And we have no knowledge as to whether, in a legitimate used car business, salesmen like Rekrut might properly insert names of third party dealers like Belanger on title certificates. Conceivably an honest intermediary, standing in Martin's shoes, might act as the agent for someone like Belanger.

In brief, we think the government was asking the jury to draw inferences beyond their unaided competence. It may well be that to an experienced eye each of the above factors *would* have been dead giveaways that the cars were likely stolen. But a jury is unable to draw such inferences from its ordinary experience. Evidence was required.

The final piece of allegedly telling evidence was that Rekrut had denied to an insurance salesman that he transported cars for Martin. The evidence that this was untruthful rests on rather hazy testimony by Cortellesso indicating that Rekrut played some indeterminate role in assisting an associate, Carnevale, deliver cars. We do not think whatever slight inference of guilty knowledge the jury could draw from Rekrut's later denial of transporting cars is sufficiently strong, by itself, to rescue the government's case.

We conclude that while the evidence undoubtedly warrants strong suspi-

cion that Rekrut was knowingly implicated, it fails to meet the standard required for proof of guilt beyond a reasonable doubt. We accordingly reverse Rekrut's conviction.

*Martin's conviction is affirmed; the conviction of Rekrut is reversed.*