**UNITED STATES of America, Plaintiff,**

v.

**Raul ORTIZ–MIRANDA (11), Defendant.**

**Criminal No. 95–029 (JAF).**

United States District Court,
D. Puerto Rico.

May 29, 1996.

Bruce A. Pagel, Special Litigation Counsel, Francisco Rebollo–Casalduc, Trial Attorney, U.S. Department of Justice, Hato Rey, PR, Guillermo Gil, United States Attorney, District of Puerto Rico, Hato Rey, PR, Theresa Van Vliet, Chief, Narcotics & Dangerous Drug Section, U.S. Department of Justice, Washington, DC, for Plaintiff.

Maria H. Sandoval, San Juan, PR, for Defendant.

### OPINION AND ORDER

FUSTE, District Judge.

Raúl Ortiz–Miranda, one of several defendants convicted of participation in a conspiracy to illegally traffic in narcotics, requests a new trial both because the government allegedly withheld Brady material and because subsequently-discovered evidence allegedly so warrants. In addition, he seeks to dismiss the indictment on similar grounds, also charging prosecutorial misconduct.

On April 18, 1996, the court held a hearing to examine the factual basis for these claims. Having exhaustively reviewed the trial record, admitted evidence, the motions of both the government and defendant, and the hearing testimony, we deny defendant's requests for a new trial and for dismissal on account of prosecutorial misconduct.

### I.

### Facts

In a superseding indictment returned on June 7, 1995, a grand jury indicted defendant with participation in an expansive drug trafficking conspiracy headed by Israel Santiago–Lugo. In the early stages of pretrial practice, counsel for defendant informally contacted prosecutors to suggest that the government had an "identification problem,"

and requesting the prosecutors to review the evidence implicating her client in the conspiracy. The defendant did not file a pretrial Fed.R.Crim.P. 12(b)(3) motion to suppress identification.[1] Without being provided any definite idea of where defense counsel deemed the government's evidence of identity lacking, the government proceeded to trial as it had originally planned, maintaining its charge against defendant Raúl Ortiz–Miranda.

On November 6, 1995, the prosecution called Noemí García, a former member of the conspiracy who, after arrest, had entered into a cooperation agreement with the government. She testified that, in the course of her participation in the Israel Santiago–Lugo organization, Raúl Ortiz–Miranda was introduced to her as "Cano Beeper." (Tr. 2620). She testified that, from her apartment's balcony, she had seen this same "Cano Beeper" drop off cash and pick up drugs on a green and white motorcycle from the apartment of one Rosa, another member of the conspiracy. (Tr. 2619, 2650, 2701). On various occasions, she took calls from this "Cano Beeper" for conspirator José Rosado–Rosado, a/k/a "Hormiguita". (Tr. 2649). Counsel for defendant Ortiz–Miranda did not attack the identification made by Noemí García as part of the cross-examination of said witness.

In opening statements, defense counsel had previously explained to the jury her intent to show that the government had arrested the wrong person. This theory went largely undeveloped, even through Noemí García's testimony, until November 15, 1995, near the end of the two-and-a-half month trial, when defense counsel cross-examined DEA Special Agent Peter Reilly about the existence of another person who went by the nickname "Cano Beeper." (Tr. 3277). Reilly, who had only analyzed phone records that showed frequent communication between Raúl Ortiz–Miranda and other members of the Israel Santiago–Lugo organization, explained on re-direct examination that he had heard of another "Cano Beeper," but that he did not know that person's real name.

On cross-examination, defense counsel presented a beeper application by which Agent Reilly had traced the telephone communications amongst the members of the Israel Santiago–Lugo organization, and asked Agent Reilly to compare the social security number and address supplied on that application to the driver's license application completed by one José A. Rivera–Meléndez. Agent Reilly agreed with counsel that the social security number of Rivera Meléndez differed by only one digit from that on the beeper application. He also agreed that the handwriting appearing on the two applications bore notable similarities. (Tr. 3291). Finally, Agent Reilly agreed that Raúl Ortiz–Miranda, as he appeared in the mug shot taken on the night of his arrest, has various facial features in common with Rivera–Meléndez.

On November 20, 1995, prosecutors asked Agent Miguel A. Andaluz, a Puerto Rico Police officer and DEA Task Force officer and case agent, whether he knew of another "Cano Beeper." (Tr. 3882). Like Agent Reilly, Agent Andaluz acknowledged that he knew of at least one other person who used the nickname "Cano Beeper." Agent Andaluz also explained that, in early November, he had presented an array of fifty-four photos to Noemí García. From amongst those photos, she identified Raúl Ortiz–Miranda as the person whom she had known as "Cano Beeper." Aware that there exists another "Cano Beeper," Andaluz asked García if she was certain that she knew the person shown in the photograph of Raúl Ortiz–Miranda as the "Cano Beeper" with whom she had dealt as a member of the Israel Santiago–Lugo organization. She confirmed her identification. (Tr. 3885).

In cross-examining Agent Andaluz on November 21, 1995, defense counsel brought to light a Puerto Rico Department of Transportation report showing that Rivera–Meléndez had received a speeding ticket aboard a green motorcycle in a development only a

---

1. Although the failure to raise the issue of identification by motion to suppress may constitute a waiver, Fed.R.Crim.P. 12(f), the court entertained such motion at the time of the Fed. R.Crim.P. 29 motion for judgment of acquittal and denied the same. *See* Tr. 3361–83; 3487–89.

few miles away from the development at which Noemí García lived.

The report also lists Rivera–Meléndez with the alias "Cano Beeper." While admitting that this information might have enabled law enforcement to identify Rivera–Meléndez as a participant in the conspiracy, Agent Andaluz explained that it would not have exonerated Raúl Ortiz–Miranda because Noemí García identified defendant as a member of the conspiracy, not by his nickname, but by having witnessed his participation in the organization's activities.

Following the testimony of Agent Andaluz, the government immediately initiated an investigation of Rivera–Meléndez. Using the information obtained by Alvin Aponte, defendant's private investigator, the government spoke with residents in one of the developments at which Rivera Meléndez was said to reside. These residents indicated that Rivera–Meléndez frequented an apartment in the development, that he was last seen entering that apartment some weeks prior, and that he would often arrive on a green motorcycle. ATF Special Agent Amado Ravelo, who headed the government's investigation, ordered a surveillance of this apartment while the trial proceeded.

As part of the investigation, the government conducted a search of a computerized database maintained by the Police Department of Puerto Rico for information on Rivera–Meléndez. This computer search revealed that Rivera–Meléndez is known and recorded in the database to go by the alias "Cano Vipper." The final page of the criminal history report also indicates that Rivera–Meléndez is the only individual known to go by an alias similar to "Cano Beeper." The government provided a copy of this report to

defense counsel, but allegedly failed to include the last page.[2]

Upon learning that residents had seen Rivera–Meléndez at this Rexville address, Agent Ravelo prepared a draft affidavit for potential use in procuring an arrest warrant. Agent Ravelo presented this draft affidavit to the prosecuting attorneys on Wednesday, November 22, 1995. On advice from Department of Justice personnel in Washington, D.C., prosecutors decided that, instead of immediately seeking an arrest warrant on the information at hand, they would direct New York-based DEA Special Agent Anthony Hinson, unrelated to the investigation, to prepare another photo array including Rivera–Meléndez, from which Hinson would ask Noemí García in New York, where she resides, to identify any individuals that she recognized as members of the conspiracy.

While awaiting decision on the results of Hinson's photo lineup, the agents conducting surveillance sighted Rivera–Meléndez at close range as he exited a development in the town of Carolina. Apparently, these agents did not clearly communicate the news that they had sighted Rivera–Meléndez to the prosecutors or the defense because they had already been told, preliminarily, that the prosecution would not seek an arrest.

On November 26, 1995, Hinson visited Ms. García and asked her to identify any individual that she recognized from an array of eight photos that included a photo of Rivera–Meléndez, but not Raúl Ortiz Miranda. She recognized no one; thus, the arrest warrant for Rivera–Meléndez never issued. Noemí García was flown down to Puerto Rico to testify for a second time regarding the Hinson photo lineup. On the second occasion, defense counsel again failed to confront her

2. Tracy L. Jarvis, the paralegal charged with transmitting this report to the defense, has submitted an affidavit stating that the government's own records include the final page of the report. She also disavows having received orders to transmit only part of the report to the defense. Likewise, government prosecutors disavow having ordered Ms. Jarvis to exclude the report's final page. In an affidavit of May 10, 1996, defense counsel claims never to have seen a nine-page computer printout of the criminal history report on Rivera–Meléndez attached to the affidavit submitted by Ms. Jarvis. We decline defen-

dant's invitation to dredge the unknowable out-of-court history of this case for wrongdoing when, as a matter of law, the error is without prejudice to defendant's case and, as a factual matter, we have only the conflicting word of the parties directly involved. Moreover, we note that defense counsel may easily have procured a copy of the criminal history directly or through defendant's private investigator. The fact that she neglected to do so should in no way shift the onus of discovery to the government or operate to exculpate her client.

with the identification issue that had been raised. (Tr. 4096–98).

At closing arguments, prosecutor Francisco Rebollo explained that the government now knew that there existed two "Cano Beepers" and that this second "Cano Beeper" may well have been a member of the Israel Santiago–Lugo organization, because it is not uncommon for members of this type of organization to trade nicknames to avoid detection. (Tr. 4211, 4225–26). While acknowledging that the other "Cano Beeper" had likely completed the beeper application shown to Agent Reilly, Rebollo noted, once again, that Noemí García had identified Raúl Ortiz–Miranda as a member of the conspiracy, not by his nickname, but by multiple visual observations of his organization-related drug trafficking.

Rebollo also summarized the other evidence implicating Ortiz–Miranda in the conspiracy. When police officers first arrested Raúl Ortiz–Miranda, it was only after an intervention, at the conclusion of which he initially refused to step out of his vehicle. In that vehicle, officers found both a firearm and narcotics after backup arrived and the officers persuaded Ortiz–Miranda to exit the vehicle. In a car related to the organization by circumstantial evidence, conspiracy members Parra–Mercado and one of the Martínez–Matta brothers drove to defendant's bail hearing. Andrés Colón–Miranda, a lieutenant to principal defendant Israel Santiago–Lugo, paid Raúl Ortiz–Miranda's bail, just as Israel Santiago–Lugo had paid the bail of defendant Andrés Colón–Miranda and other members of the conspiracy.

When Puerto Rico Police officers arrested defendant in his Isla Verde, Urano Street apartment, they found him in the possession of a bag of illegal weaponry, including loaded, long-barreled semi-automatic firearms; "cop killer" bullets, and standard and snaildrum ammunition clips. In his apartment they also found cocaine that he had apparently hurriedly attempted to flush down the toilet. Along with the cocaine, they found hundreds of small plastic bags, including a number of the trademark "Cristal" used by the organization to parcel out heroin for resale. Puerto Rico Police reports refer to Raúl Ortiz–Miranda as using the nickname "Cano".

As we have already noted, Agent Reilly testified that telephone records show more than fifty telephone calls between Raúl Ortiz–Miranda and other members of the conspiracy. Finally, of course, Noemí García testified that Raúl Ortiz–Miranda worked as a "runner", picking up money and delivering narcotics for the Israel Santiago–Lugo organization.

In closing argument, counsel for defendant argued that, owing to the brevity of her participation in the organization, Noemí García would have had few occasions upon which to observe the person she claims to recognize in the person of Raúl Ortiz–Miranda. (Tr. 4373). Counsel also conveyed to the members of the jury that they could not convict Raúl Ortiz–Miranda of anything, "if the government hasn't proven beyond a reasonable doubt that he is Cano Beeper." (Tr. 4382). In an attempt to discount the other evidence of guilt presented at trial, counsel argued that officers had planted both the drugs and firearms in defendant's apartment, and then forced defendant to sign an inventory form acknowledging that the officers had seized these items along with other personal items from defendant's apartment. (Tr. 4387, 4390) Of course, counsel also contends that Noemí García mistook Raúl Ortiz–Miranda for José Rivera–Meléndez or deliberately lied about Ortiz–Miranda's participation in the conspiracy because her dependence on the federal government for both money and leniency motivated her to do so. Despite these arguments, the jury convicted Raúl Ortiz–Miranda, along with all but one of the other defendants, where the jury could not agree.[3]

On the first day of jury deliberations, defense counsel learned by chance encounter with Agent Ravelo that federal agents had located Rivera–Meléndez but had decided not to make an arrest. With this information, and upon conviction, defense counsel moved for a mistrial and issued a press release, copy

---

**3.** This codefendant, Angel Andrades–Marrero, eventually pled guilty and thus avoided the need for his retrial.

of which is appended hereto as *Appendix A*.[4] *See Docket Document No. 937*. In an effort to determine the factual basis for these claims of prosecutorial misconduct, we scheduled a hearing.

After the first half of the defendants had been tried, but before the trial of the second half of the defendants had begun, codefendant in the second group José A. Parra–Mercado[5] became a cooperating witness and told government prosecutors that the only "Cano Beeper" of whom he knew in the Israel Santiago–Lugo organization was Rivera–Meléndez. These statements came to light only after the trial of the second half of the defendants, when defense counsel contacted Parra–Mercado by telephone.

At the hearing held April 18, 1996, Agent Ravelo testified that he approached prosecutor Rebollo on November 22, 1995, for authorization to seek an arrest warrant for Rivera–Meléndez. In turn, prosecutor Rebollo testified that, on that same day, he consulted his superior, Theresa Van Vliet, Chief, Narcotics and Dangerous Drugs Section, Department of Justice, Washington, D.C. Van Vliet decided that it would be irresponsible to arrest Rivera–Meléndez on the basis of the scarce information at hand and that the prudent course of action was to prepare the photo lineup that Agent Hinson subsequently conducted in New York. At all times, Van Vliet made it clear to the prosecutors that if Ortiz–Miranda happened to be the wrong person, the Department of Justice would clear him of charges.

Defense counsel called José Parra–Mercado at the hearing to elicit testimony confirming that he had made the statements at his debriefing of which he told defense counsel in their telephone conversation. He confirmed that he had made these statements, though he admitted at the hearing that he did not know who operated the Vega Baja drug point about which Noemí García had testified and where she had observed Raúl Ortiz–Miranda participate in drug-related activities. As a matter of fact, Parra Mercado had no knowledge or details about that drug point at the Enrique Catoni housing project in Vega Baja. Parra–Mercado also testified that Rivera–Meléndez had charge of two motorcycles used by the organization, one black and red, and the other green and white.[6]

In general, however, Parra–Mercado's testimony did little to exculpate defendant. Parra–Mercado acknowledged that one of the nicknames by which he knew Raúl Ortiz–Miranda ("El Jincho") is synonymous with the nickname ascribed to him by Noemí García ("Cano"), both terms connoting a person of fair complexion. He also placed Raúl Ortiz–Miranda at the side of Andrés Colón–

4. It will be apparent to the reviewers of this record that the motion practice, spoken word, and attitude of the prosecutors were at all times decorous, straightforward, and respectful to the court as an institution. The reviewers of this record will also have no difficulty in appraising the other side of the coin. While we applaud zealous defense in a criminal case, defense counsel for Ortiz–Miranda and some of her colleagues assumed extraordinary postures that bordered on sanctionable conduct. The record confirms this conclusion. One example is the post-conviction press release issued by defense counsel for Ortiz–Miranda, accusing both the prosecutors and the court of grievous misconduct. The comments contained therein might have affected the integrity of the second half of the trial, thus, taking considerable liberty with proscriptions of Model Rules of Professional Conduct Rule 3.5 (1983) and Local Rule 211(4)(B). This press release and countless other acts of desperation often required the court to devote extraordinary energy and effort so as not to fall into the trap tendered, perhaps to cause a mistrial or to induce error.

It is unfortunate that defense counsel could not argue the law and facts of this case zealously without attacking the integrity and professionalism of the court and the prosecution. Nonetheless, we take comfort in the fact that the record leaves the Court of Appeals with an accurate picture of the tone that characterized the trial strategy of defendant Ortiz–Miranda. This required that the court at times handle the matter with sternness and some skepticism, a recognized part of the judge's trial management arsenal. *See United States v. López*, 71 F.3d 954, 959 (1st Cir.1995).

5. Owing to the number of defendants charged in this case, the court bifurcated the proceedings, trying Raúl Ortiz–Miranda with the first group of defendants, and the remaining defendants in a second group.

6. Importantly, we note that, just as Rivera–Meléndez had received a speeding ticket while aboard a green and white motorcycle, Raúl Ortiz–Miranda had received a speeding ticket while aboard a black and red motorcycle.

Miranda in making deliveries of crack cocaine in Arecibo and involved in an unrelated marijuana operation in Bayamón. Moreover, he testified that, in 1994, Wes Solano–Moreta, the leader of a gang in competition with Israel Santiago–Lugo, wanted Raúl Ortiz–Miranda dead. Finally, Parra–Mercado agreed that, by prosecutor Rebollo's definition of the term "conspiracy", Raúl Ortiz–Miranda had been a conspirator.

## II.

### *Applicable Law*

### A. *Brady Material*

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1972), the Supreme Court first decided that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. In the years immediately following *Brady*, the lower courts struggled, without significant guidance, to determine when evidence favors the accused and, more importantly, when favorable evidence is "material". In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court created a tripartite standard by which the courts would measure the materiality of evidence withheld. "Materiality", as the *Agurs* court uses the term, has less to do with the elements of the crime than the prejudice to the defendant's case caused by the suppression. Unfortunately, *Agurs* required the courts to determine which standard of prejudice to apply by the degree to which prosecutors had acted in bad faith, effectively dividing the analysis along lines that *Brady*, itself, had expressly rejected.[7] Worse, two of the three standards proved indistinguishable from one another.

Nine years later, the Court finally revisited the issue when, in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), it consolidated the three standards of prejudice. In adopting the standard of prejudice enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *Bagley* explains that

> evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. In *Kyles v. Whitley*, —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court's latest explication of *Brady*, the Court reaffirms the *Bagley* definition of "materiality" and explains that the courts must measure prejudice by the cumulative effect that all suppressed evidence would likely have had on the outcome of the trial.

While the Supreme Court has, in the passage of time, explained "materiality", the lower courts continue to struggle in determining when evidence of questionable import "favors" the accused. Our own musings suggest, however, that we do best to leave the question subsumed in the prejudice determination, as is the practice under *Strickland*. Evidence, itself of little exculpatory value, that would likely have led the defense to other, strongly exculpatory evidence would still prove "material" by virtue of having created doubt in the outcome of the trial. Evidence that would not likely have led to other more clearly exculpatory evidence, or evidence, itself, of ambiguous import, would not, if suppressed, give rise to a constitutional violation because a claim of prejudice can never be more certain than the evidence upon which it stands.

---

7. *Agurs* requires a new trial where:
   (1) the prosecution knew or should have known that its case contained perjured evidence, and there was "any reasonable likelihood" that the false evidence "could have affected" the outcome of the case; or
   (2) the prosecution fails to reply to a request for specific exculpatory information, and this evidence "might have affected" the outcome of the case; or
   (3) the defendant issues no request or only a generalized request for exculpatory information, and the undisclosed evidence "creates a reasonable doubt that did not otherwise exist." *See generally, Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

We discern just such an approach already in use amongst the circuit courts of appeals. In *United States v. Polowichak*, 783 F.2d 410 (4th Cir.1985), a case factually similar to ours, the court held that prosecutors had not fallen afoul of the Fifth Amendment in suppressing the identity of "Jay", a key co-conspirator still at large. In rejecting the claim of prejudice, the court explained that,

> [i]n this case, defendants have speculated that this information might have led them to Jay, who might have provided exculpatory evidence. Even had defendants succeeded in locating Jay, it seems unlikely that, a fugitive from justice, he would return to testify for defendants. Moreover, defendants present no reason to believe that Jay's testimony would prove exculpatory.

*Id.* at 414. The Court of Appeals for the Fifth Circuit agrees that it matters not whether the court dignifies the suppressed evidence with the term "exculpatory" or "favorable" if the speculative and tangential nature of the evidence operates to prevent it from inducing reasonable doubt in the triers of fact. *United States v. Beasley*, 582 F.2d 337 (5th Cir.1978). *See also United States v. Sink*, 586 F.2d 1041 (5th Cir.1978).

### B. *Subsequently Discovered Evidence*

■ In what we must conclude was a strategic "hail Mary," defense counsel has requested a new trial under Fed.R.Crim.P. 33, even after we initially ruled from the bench against defendant's *Brady* argument, for if the requirements of *Brady* are stringent, much more so are those of Rule 33. The prosecution correctly cites *United States v. Formanczyk*, 949 F.2d 526 (1st Cir.1991), for the four-element new-trial standard; a motion for new trial on ground of

> [n]ewly discovered evidence will not be granted unless the moving party can demonstrate that (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to a lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or im-

peaching; and (4) it will probably result in an acquittal upon retrial of the defendant. *Id.* at 531 (quoting *United States v. Martin*, 815 F.2d 818, 824 (1st Cir.1987)). As noted in the *Agurs* dissent, the last of these elements bears remarkable similarity to the prejudice analysis conducted under *Brady* and its progeny. *Agurs*, 427 U.S. at 120, 96 S.Ct. at 2405.

## III.

### *Analysis*

### A. *Brady Material*

■ Defendant claims error in (1) the prosecutor's failure to disclose the draft probable cause affidavit prepared by Agent Ravelo for possible use if necessary; (2) the failure of Agent Andaluz to reveal, prior to Thanksgiving week, 1995, that he knew of the existence of a "Cano Beeper" other than Raúl Ortiz–Miranda; (3) the failure of prosecutors to produce the final page of the criminal history report on Rivera–Meléndez, and (4) the prosecutors' failure to notify the defense that José Parra–Mercado had identified Rivera–Meléndez as the only "Cano Beeper" of whom he knew. We isolate the exculpatory value of each piece of evidence individually, though we assess the impact of the claims on the outcome of the case collectively.

### 1. *Exculpatory Value*

#### a. *Probable Cause Affidavit*

We note, at the outset, that the content of Agent Ravelo's draft of a probable cause affidavit for the arrest of Rivera–Meléndez does nothing to exculpate Raúl Ortiz–Miranda.[8] The evidence to support the involvement of Rivera–Meléndez in the activities of the organization does not conflict or supplant the evidence supporting the conviction of Raúl Ortiz–Miranda. Nonetheless, the evidence "favors" defendant's claim of misidentification, insofar as it does not conflict with the evidence contained in the Department of Transportation report about which defense counsel questioned Agent Andaluz. It also suggests a closer connection between Riv-

---

**8.** The affidavit recites evidence to suggest that Rivera–Meléndez was trafficking in narcotics and

possessed a firearm in violation of 18 U.S.C. § 922(g)(1).

era–Meléndez and narcotics trafficking than the jury could glean from the Department of Transportation report alone.

Defendant also contends that the draft affidavit would have enabled him to procure exculpatory testimony from Rivera–Meléndez and, perhaps, subject Noemí García to yet another identification lineup. As we noted in discussing the *Polowichak* case, we deem the improbability that Rivera–Meléndez, already a fugitive of the law, would inculpate himself in the conspiracy in order to absolve Ortiz–Miranda, an improbability best considered as it undercuts the likelihood with which the evidence might affect the trial outcome. Likewise, the improbability that, after having identified Raúl Ortiz–Miranda twice out of court and twice in court, and having failed to identify Rivera–Meléndez on any of these occasions, Noemí García would now, suddenly, identify Rivera–Meléndez as the "Cano Beeper" with whom she had dealt while a member of the Israel Santiago–Lugo organization, is an improbability best addressed as it undercuts the chance of a different trial outcome.

### b. *Andaluz Testimony*

█ We reject the claim that Agent Andaluz concealed knowledge of the identity of a "Cano Beeper" other than Raúl Ortiz–Miranda. None of the evidence presented at trial or at the subsequent hearing places Agent Andaluz in the possession of such knowledge prior to cross-examination on November 21, 1995. Though he did acknowledge that he knew of another "Cano Beeper" as early as the November 4, 1995, interview with Noemí García, he explained clearly that he did not then know the name of the other "Cano Beeper." At most, all that one can reasonably infer from his testimony is that Agent Andaluz knew that this other "Cano Beeper" was not Raúl Ortiz–Miranda. None of the other evidence presented at trial conflicts or renders implausible this explanation; accordingly, we find the claim meritless.

### c. *Criminal History Report*

█ Defendant does correctly claim, however, that the final page of the criminal history report would have "favored" his misidentification defense. The final page of the

report indicates that the computer database shows no one besides Rivera–Meléndez with an alias similar to "Cano Beeper." Of course, as the government argues, the computer database may have been incomplete, but this possibility serves only to subtract from the probative value of the evidence, not from its favorableness to the defendant. And, though we doubt highly that the prosecutors in this case, with a record of straightforwardness and honesty, would have deliberately withheld the final page of the report, *Brady* does not except accidentally-withheld evidence.

### d. *Parra–Mercado Debriefing*

The statements of Parra–Mercado at his initial debriefing that identify Rivera–Meléndez as a "Cano Beeper" working within the Israel Santiago–Lugo organization, do favor defendant's case by placing Rivera–Meléndez in closer relation to the Israel Santiago–Lugo organization than the jury could reasonably glean from the other evidence presented at trial. While Parra–Mercado disclaimed knowledge of the workings and personnel that staffed the drug point at which Noemí García testified Raúl Ortiz–Miranda had worked, this weakness in the testimony Parra–Mercado would have offered undermines only the probative value of his testimony, not the favorableness of that testimony to defendant.

We note, however, that the vast majority of Parra–Mercado's testimony at the post-trial hearing actually implicated Raúl Ortiz–Miranda in the activities of the Israel Santiago–Lugo organization. Parra–Mercado testified that, on various occasions, Ortiz–Miranda joined conspiracy member Andrés Colón–Miranda to make deliveries to drug points in Arecibo and had other drug-related activities in Bayamón. In fact, Parra–Mercado went so far as to explain that, using prosecutor Rebollo's definition of a "conspiracy", Raúl Ortiz–Miranda's activities made him a conspirator.

█ Whatever effect Parra–Mercado's testimony may have had on the outcome of the trial, this evidence does not fall within the ambit of *Brady* because Parra–Mercado had

not made the allegedly exculpatory statements to the prosecution until after the first half of the trial had ended. At best, then, Parra–Mercado's testimony may constitute newly-discovered evidence. We address this last proposition separately from our *Brady* analysis.

### 2. *Materiality*

The only evidence that attaches to Raúl Ortiz–Miranda by way of his nickname is the testimony of Noemí García. As the government notes, however, this same evidence also attaches to Raúl Ortiz–Miranda by way of Ms. García's visual identification of Raúl Ortiz–Miranda as the person with whom she had dealt and whose actions she had witnessed as a member of the Israel Santiago–Lugo organization. Even if she erred in recollecting his nickname, her testimony would continue to inculpate Raúl Ortiz–Miranda if she had correctly identified him by sight.

Of course, the defendant has argued that García's visual identification must have been mistaken because Rivera–Meléndez is, allegedly, the only "Cano Beeper" within the Israel Santiago–Lugo organization. Apparently afraid of the answer García might give, defense counsel chose not to try this theory out with García when she was called to the stand on two occasions. The defense did establish, however, that there exists a person by the name of José A. Rivera–Meléndez who rides a green and white motorcycle and who goes by the nickname "Cano Beeper." The final page of the criminal history report would have shown that the only "Cano Beeper" in the database is Rivera–Meléndez.[9] In opposition to this evidence stands the similarity in meaning of the nickname shown in the criminal history of Ortiz–Miranda and the nickname "Cano Beeper." In our estimation, this evidence is only very weakly probative.

The information contained in Agent Ravelo's arrest warrant draft affidavit does little to bolster the misidentification defense. As we have already noted, the information contained in the affidavit itself does nothing to exculpate defendant; nor would it have likely led to more clearly exculpatory evidence. Thus, even as it might have supported evidence that was presented at trial, the sum of evidence withheld is hardly of the variety that would undermine our confidence in the outcome of the trial. The weaponry and narcotics found in Raúl Ortiz–Miranda's possession each time he was arrested, the trademark packaging material with which he was found when arrested at his apartment, the telephone records linking him with the members of the organization, and the source of his bail money all strongly suggest that, whatever may have been his nickname, Noemí García had not identified the wrong man when she detailed Raúl Ortiz–Miranda's participation in the Israel Santiago–Lugo organization.

### B. *Newly–Discovered Evidence*

#### 1. *Unknown or Unavailable Evidence*

■ The chronology of events indicates that the only evidence not discovered by the end of Raúl Ortiz–Miranda's trial were the statements of José Parra–Mercado.[10] We deem it highly unlikely that Parra–Mercado would have testified about his personal knowledge of the Israel Santiago–Lugo organization before he had entered the plea agreement that he signed after trial of the first half of the defendants had concluded. Accordingly, this evidence would not have been known or available to defendant at the time of trial.

#### 2. *Diligence*

Defense counsel made a strategic decision to withhold the details of its theory of misidentification until the final weeks of trial. Under the second prong of our new-trial analysis, this strategic move would estop almost any complaint that exculpatory evidence surfaced too late. Nonetheless, we cannot say that Parra–Mercado would likely have made his statements linking Rivera–

---

9. Of course, there exists the obvious possibility, indeed, probability, that the database is both incomplete and lags behind the evolution of nicknames as they are used on the street.

10. We have already considered evidence discovered but not shared under the rule of *Brady*.

Meléndez to the Israel Santiago–Lugo organization prior to Parra–Mercado having first entered into the plea agreement that he signed only after the trial by which the jury convicted Raúl Ortiz–Miranda. We must conclude, therefore, that failure to learn of this evidence was not due to a lack of diligence by the defendant.

### 3. *Evidence Not Merely Cumulative*

The testimony that Parra–Mercado would have offered does, in large measure, tend merely to confirm the information contained in the Department of Transportation records presented at trial. The evidence is not wholly cumulative, however, because Parra–Mercado's testimony would actually have placed Rivera–Meléndez within the Israel Santiago–Lugo organization—something the evidence presented at trial had not already done.

### 4. *Improbability of Acquittal*

Despite the likelihood that Parra–Mercado's testimony would have supported Raúl Ortiz–Miranda's misidentification defense, we do not believe that the newly-discovered evidence would probably have resulted in acquittal. Parra–Mercado admitted that he knew only that part of the Israel Santiago–Lugo organization in operation in Arecibo and Bayamón; thus, he could testify only that he knew of no "Cano Beeper" other than Rivera–Meléndez amongst those members of the organization that he knew at Arecibo and Bayamón. Nonetheless, there exists a possibility, though still much less than a probability, that this testimony, in conjunction with the Department of Transportation report, Agent Ravelo's probable cause draft affidavit, and the final page of the criminal history report, would have cast sufficient doubt upon Noemí García's testimony to have rendered her testimony unreliable in the jury's estimation.

As his hearing testimony demonstrates, Parra–Mercado's trial testimony would not have favored Raúl Ortiz–Miranda so categorically. As we have already noted, Parra–Mercado would have testified that Raúl Ortiz–Miranda made a number of deliveries with Andrés Colón–Miranda, Israel Santiago–Lugo's "right-hand man," to the Arecibo

housing project at which Parra–Mercado worked, the same way Rivera–Meléndez would ordinarily join Andrés Colón–Miranda on other Arecibo deliveries. Parra–Mercado would even have agreed that, by prosecutor Rebollo's definition, Raúl Ortiz–Miranda's activities made him a member of the Israel Santiago–Lugo conspiracy. Even if Parra–Mercado's testimony about Rivera–Meléndez would have led the jury to discredit Noemí García's testimony, the inculpatory evidence Parra–Mercado's testimony would have supplied, along with the other evidence presented at trial, would undoubtably have led to conviction. We cannot say, therefore, that the newly-discovered evidence would probably have led to acquittal upon retrial of the defendant.

### IV.

### *Conclusion*

We deny defendant's motions for a new trial because, considered collectively, the newly-revealed and newly-discovered evidence would not, with any probability, have affected the outcome of the trial. In addition, we find no evidence of prosecutorial misconduct, much less prosecutorial misconduct warranting the extraordinary remedies sought by defendant.

This disposes of *Docket Document Nos. 937, 952, 969, 1138, 1156, 1157, 1173, 1185, and 1232.*

**IT IS SO ORDERED.**

### *APPENDIX "A"*

PRESS RELEASE
FILED ON BEHALF OF RAUL ORTIZ
MIRANDA
CRIM. NO. 95–29(JAF)

LAW OFFICE OF MARIA
H. SANDOVAL

Today, December 13, 1995, the jury convicted Raúl Ortiz Miranda of the three counts with which he was charged, conspiracy to possess drugs with the intent to distribute, possession of drugs in conjunction with a firearm and a forfeiture count. Mr. Ortiz Miranda was convicted after being on trial

for three months before the Honorable Judge José A. Fusté, and after the jury deliberated for ten (10) days. The government alleged that Raúl Ortiz Miranda was a member of a drug organization allegedly headed by Israel Santiago Lugo. It was Mr. Ortiz' contention throughout the trial that the government's investigation had been sloppy, that Mr. Ortiz had been misidentified and that Raúl Ortiz Miranda was not associated in any way with the Israel Santiago Lugo organization.

In this case, the government made a huge blunder. They arrested the wrong person. The evidence indicated that it had relied on the erroneous identification made of Raúl Ortiz Miranda by Police of Puerto Rico Agent, Miguel Andaluz. (Mr. Andaluz' testimony is enclosed.) Mr. Andaluz is presently assigned to the Drug Enforcement Administration Task Force and has been there for the last five years. In his testimony, Mr. Andaluz admitted that he had never bothered to obtain a photograph of the *only* person in the archives of the Police of Puerto Rico who is known as "Cano Beeper." Mr. Ortiz proved at trial that the alias attributed to him by the Police of Puerto Rico was "Blanco" and that he had never been known as "Cano Beeper." In question after question posed to Mr. Andaluz, he repeatedly answered that any further investigation as to the person known as "Cano Beeper" " . . . was not necessary." Mr. Andaluz, in his testimony, never explained to the jury his not having taken the extra step to obtain a photograph of the real "Cano Beeper" to show to prosecutors and to show the eyewitness, Noemi García, who was relied on by the government to identify Mr. Ortiz Miranda. Had Mr. Andaluz procured a photograph of the real "Cano Beeper," prosecutors would have been alerted that the person they were seeking to arrest and who was allegedly linked to this reputed drug organization was not Mr. Ortiz Miranda but a man known as José A. Rivera Meléndez. (Mr. José A. Rivera Meléndez is presently accused of having participated in a shoot-out with National Guardsmen in August of 1995 in Barrio Obrero. The evidence indicated that Mr.

José A. Rivera Meléndez bears a striking resemblance to Raúl Ortiz Miranda.)

When it became apparent, in mid-trial, that Mr. Raúl Ortiz Miranda had been completely misidentified and that there were numerous links in the government's own evidence to José A. Rivera Meléndez, the government, instead of dismissing the case against Mr. Ortiz Miranda, became intransigent and stubbornly refused to concede its error. Prosecutors elected to pursue their prosecution of Mr. Ortiz Miranda, in the defense's opinion, in bad faith.

The evidence, by the conclusion of the trial, indicated that the person whom the government had always sought to arrest was José A. Rivera Meléndez and not Mr. Ortiz Miranda. Numerous items of evidence in the government's proof linked José A. Rivera Meléndez to the government's case. A document, for example, known as the "Mega Page Beeper Application" introduced into evidence by the U.S. Department of Justice Trial Attorney Bruce Pagel, linked José A. Rivera Meléndez to a green motorcycle that was allegedly utilized to ferry drugs and money from the Enrique Cattoni Public Housing Project. The green motorcycle was clearly described by Noemi García, one of the government's three witnesses granted immunity or leniency in exchange for cooperation. The green motorcycle had a motor number and plate number that corresponded exactly to the motorcycle driven by José A. Rivera Meléndez in August of 1994, a critical time period in the government's case. The evidence introduced by the defense proved that José A. Rivera Meléndez had received speeding tickets in the area of the housing projects where Noemi García said that "Cano Beeper" had allegedly ferried drugs and money. The various housing projects and their locations were made reference to throughout the government's case.

Additionally, there was the candid and truthful admission of Drug Enforcement Administration Agent Peter Reilly, who said that the handwriting of José A. Rivera Meléndez on a driver's license application was virtually identical to the handwriting on the Mega Page beeper application. (Agent Reilly's testimony is enclosed.) Agent Reilly also

conceded that whoever had filled out the application had altered one or two digits of the Social Security number, the address and the driver's license number of José A. Rivera Meléndez. In spite of all this uncontroverted evidence, the government refused to do the right thing and continued to prosecute Mr. Ortiz Miranda rather than admit it had made a terrible mistake.

Mr. Ortiz Miranda contended in his closing argument and still contends that the government acted in bad faith. The government always had the power not only to arrest the real "Cano Beeper" but could have brought him to court so that the jury could have seen for themselves what he looked like and so that they could have seen for themselves the striking resemblance between Mr. Rivera and Raúl Ortiz Miranda. Prosecutors refused do this, even though agents, during the Thanksgiving recess, located the real "Cano Beeper" at one of the addresses introduced into evidence by the defense. Furthermore, prosecutors were alerted to this fact and the fact that a green motorcycle was seen at said address. Prosecutors advised agents who were in favor of arresting Mr. Rivera Meléndez, during the Thanksgiving recess, that they should not do it for fear they might lose the case.

On this basis, counsel for Mr. Ortiz Miranda moved to dismiss the indictment alleging prosecutorial misconduct. District Court Judge José A. Fusté summarily dismissed the allegations of prosecutorial misconduct and refused to investigate the matter further after Prosecutor Bruce Pagel essentially denied the allegations. However, agents informed defense counsel that this is precisely what had occurred and indicated they had informed prosecutors that Mr. Rivera Meléndez looked a great deal like Mr. Ortiz. Prosecutors, for that reason, reprimanded agents and forbade them from talking to defense attorneys while the jury was deliberating in an attempt to silence them from telling counsel what had occurred.

Defense attorneys and defendants have absolutely no power to arrest, nor can a defendant ask the court to arrest someone. Only prosecutors have that power. In that sense,

prosecutors' conduct fell well below the mark of what is appropriate ethical and legal conduct and the canons that govern this situation.

Counsel for Mr. Ortiz also moved to dismiss the indictment today on the basis of prosecutorial misconduct for the additional reason that prosecutors had withheld exculpatory evidence from Mr. Ortiz. The exculpatory evidence had to do with an informant of the Police of Puerto Rico, José Rafael Cotto Fuentes, who was killed at Plaza Las Américas last year. Mr. Ortiz requested access to the debriefings of Mr. Cotto, a fact which Mr. Rebollo at the start of trial said did not exist. Later, he admitted that debriefings had occurred and that notes were taken, however, counsel for Mr. Ortiz was not given access to them during her cross examination of Caguas Police of Puerto Rico Agent Sergeant Diego Figueroa because, according to the law, defense counsel is entitled to said materials only if they contain information which can be used to impeach a witness. Judge Fusté ruled they did not, and that counsel, therefore, could not see them. However, a former Assistant U.S. Attorney informed counsel for Mr. Ortiz that Agent Diego Figueroa was suspected of serious police corruption and that his conduct had been mentioned by Mr. Cotto before his death and corroborated by third parties. During the course of the trial, counsel for Mr. Ortiz informed the district court that she had been informed that Diego Figueroa and other agents were being investigated by the Commonwealth Department of Justice. Federal prosecutors denied any knowledge of this.

They also refused to test all the correlations between their own evidence and the real "Cano Beeper." They did this only because they wanted to win at all costs and at the expense of the truth. The government lost all perspective. The conduct of prosecutors, however, is regulated by the Canons of Ethics enacted by the federal court in Puerto Rico. It is also regulated by the U.S. Attorney's Manual. Under these circumstances, the government was clearly obligated to take affirmative steps in arresting José A. Rivera Meléndez, or, at minimum, to take him in for

questioning. *Furthermore, they were required to make him available to the defense.*

Because of tactical maneuvering done by prosecutors in this case and the unreasonable posture the government assumed, prosecutors, particularly, Francisco Rebollo, were forced to exceed the limits imposed by law on closing arguments. Mr. Rebollo, in his final closing argument, went so far as to say that the government "knew all along that there were two Cano Beepers" and that they were "both in the Israel Santiago Lugo organization." There was, of course, no basis for this extraordinary statement and Mr. Ortiz' counsel states that this statement, more than anything else confused and mislead the jury. Moreover, counsel for Mr. Ortiz Miranda states that this statement was made in violation of the mandate of the Court of Appeals urging prosecutors in the District of Puerto Rico to refrain from making objectionable and unfounded statements before juries just for the sake of winning cases.[1] Mr. Rebollo also went so far as to invoke the fact that his father was "a law enforcement officer," and said that his father had always told him that being a law enforcement officer is a "thankless" job. This comment is itself a violation of the Canons of Ethics and violated the rules of what is known as "fair comment" which govern closing arguments. By doing so, Mr. Rebollo hoped to remind jurors that his father sits on the Supreme Court of Puerto Rico and took unfair advantage of his social position in Puerto Rico's society.

Mr. Rebollo went on to make many other comments, not only against Mr. Ortiz Miranda, but other defendants which were not founded on the record or based on the testimony or the documents admitted in evidence.

Mr. Raúl Ortiz Miranda intends to file an appeal of his conviction before the Court of Appeals for the First Circuit. One of the principal bases for appeal shall be the bias manifested by the court toward Mr. Ortiz and its numerous rulings disallowing the introduction of favorable evidence and its rulings repeatedly limiting cross examination of key witnesses, while at the same time allowing the government to present multiple witnesses for the same event or fact, vertically granting every government petition Counsel for Mr. Ortiz Miranda requested the Honorable Judge Fusté to recuse himself during the trial but he refused to do so saying that he was impartial. It will be up to the Court of Appeals to examine this record in its entirety to determine if the court committed reversible errors.

---

1. See San Juan Star article regarding Judge Toruella's opinion in *United States v. Levy Cordero.*