<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 96-1711

                         UNITED STATES,
                           Appellee,

                               v.

         EULALIO CANDELARIA-SILVA, A/K/A GATILLO MACHO,
                     Defendant, Appellant.

                      ____________________

No. 96-1712

                         UNITED STATES,
                           Appellee,

                               v.

             RAUL ORTIZ-MIRANDA, A/K/A CANO BEEPER,
                     Defendant, Appellant.

                      ____________________

No. 96-1713

                         UNITED STATES,
                           Appellee,

                               v.

                    MOISES CANDELARIA-SILVA,
                     Defendant, Appellant.

                      ____________________

No. 96-1714

                         UNITED STATES,
                           Appellee,

                               v.

                     CELENIA REYES-PADILLA,
                     Defendant, Appellant.

                      ____________________

No. 96-2275

                         UNITED STATES,
                           Appellee,

                               v.

                     JOSE A. ROSADO-ROSADO,
                     Defendant, Appellant.

                      ____________________

No. 96-2362

                         UNITED STATES,
                           Appellee,

                               v.

                   NELSON MIGUEL ORTIZ-BAEZ,
                     Defendant, Appellant.

                      ____________________

No. 96-2364

                         UNITED STATES,
                           Appellee,

                               v.

                     ROSA MORALES-SANTIAGO,
                     Defendant, Appellant.

                      ____________________

         APPEALS FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

         [Hon. Jos Antonio Fust, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                Lynch and Lipez, Circuit Judges.

                     _____________________

   Raymond L. Snchez-Maceira, by appointment of the Court, for
appellant Eulalio Candelaria-Silva.
   G. Richard Strafer, by appointment of the Court, with whom
Quion & Strafer, P.A., was on brief, for appellant Ral Ortiz-
Miranda.
   Enrique Vlez-Rodrguez, by appointment of the Court, for
appellant Moiss Candelaria-Silva.
   Salvador Prez-Mayol, by appointment of the Court, for
appellant Celenia Reyes-Padilla.
   Lydia Lizarribar-Masini, by appointment of the Court, for
appellant Jos Rosado-Rosado.
   Rafael Anglada-Lpez, by appointment of the Court, for
appellant Nelson Miguel Ortiz-Bez.
   Marlene Aponte-Cabrera, by appointment of the Court, for
appellant Rosa Morales-Santiago.
   Lena D. Watkins, Trial Attorney, Narcotic and Dangerous Drug
Section, Criminal Division, U.S. Department of Justice, with whom
James K. Robinson, Assistant Attorney General, Criminal Division,
U.S. Department of Justice, Theresa M.B. Van Vliet, Chief, Narcotic  
and Dangerous Drug Section, Criminal Division, U.S. Department of
Justice, Robert Lipman and Grace Chung Becker, Trial Attorneys,
Narcotic and Dangerous Drug Section, Criminal Division, U.S.
Department of Justice, were on brief for appellee.

                      ____________________

January 22, 1999                   
                     ____________________

        TORRUELLA, Chief Judge.  Defendant-appellants were charged with
conspiracy to possess with intent to distribute and distribution
of cocaine base, cocaine, heroin, and marijuana, in violation of
21 U.S.C.  841 & 846.  In addition, Count 43 of the indictment
 charged Nelson Ortiz-Bez ("Ortiz-Bez") with engaging in a
monetary transaction in criminally derived property, in violation
  of 18 U.S.C.  1957.  Count 46 charged Eulalio and Moiss
Candelaria-Silva with possessing cocaine base, cocaine and heroin
with intent to distribute, in violation of 21 U.S.C.  841(a)(1).  
Count 49 alleged the defendants' joint and several liability for
  forfeiture of $6,000,000, including substitute assets, as
                authorized by 21 U.S.C.  853.
        The jury returned guilty verdicts as to all of the defendants in
this appeal as well as special forfeiture verdicts.  The district
   court sentenced the defendants to the following terms of
imprisonment:  (1) 480 months for Ortiz-Bez; (2) 540 months for
Ral Ortiz-Miranda ("Ortiz-Miranda"); (3) 210 months for Celenia
Reyes-Padilla ("Reyes-Padilla"); (4) 168 months for Rosa Morales-
  Santiago ("Morales-Santiago"); (5) 660 months for Eulalio
Candelaria-Silva; (6) 360 months for Moiss Candelaria-Silva; and
(7) 480 months for Jos Rosado-Rosado ("Rosado-Rosado").  The
    district court also issued a Final Order of Forfeiture
encompassing substitute property of Reyes-Padilla, pursuant to 21
                      U.S.C.  853(p).  
        Defendants base their appeal on numerous evidentiary and
procedural grounds.  For the following reasons, we AFFIRM the
               judgment of the district court.
BACKGROUND The government presented the testimony of three co-
conspirator witnesses, Marcos Hidalgo-Melndez ("Hidalgo"),
Carlos Otero-Coln ("Otero-Coln"), and Noem Garca-Otero
("Garca-Otero").  Hidalgo pleaded guilty to Count One of the
Superseding Indictment.  Otero-Coln and Garca-Otero received
immunity from prosecution in exchange for their cooperation.  In
addition, the government presented the testimony of numerous
local police officers who executed search warrants or were
otherwise involved in the investigation of the defendants and
their co-conspirators.  The government also presented documentary
and forensic evidence and testimony relating to firearms and
drugs seized from the co-conspirators, and other pertinent
evidence.                        
        The co-conspirator witnesses testified that Israel Santiago-Lugo
 ("Santiago-Lugo") operated several drug distribution points
("puntos") at various housing projects in the northern region of
  Puerto Rico.  With the assistance of his co-conspirators,
   Santiago-Lugo distributed vast quantities of controlled
substances including:  1) heroin sold under the name "cristal";
(2) cocaine sold under the names "bolso rojo" and "rolito"; (3)
               cocaine base; and (4) marijuana.

                A.  The Virgilio Dvila Punto
        Hidalgo testified that he, Ortiz-Bez, and Wilfredo and David
    Martnez-Matta began working for Santiago-Lugo's drug
distribution ring sometime after Hidalgo moved to the Virgilio
Dvila housing project in 1990.  He also testified that Ortiz-
Bez and others packaged drugs at two rented apartments in Isla
  Verde and transported the drugs to various puntos. Hidalgo
 further testified that Reyes-Padilla, Santiago-Lugo's aunt,
  distributed drugs from a Virgilio Dvila apartment used by
 Santiago-Lugo's grandparents.  From this apartment, Morales-
  Santiago supplied Santiago-Lugo's distributors with drugs,
including heroin and cocaine, and maintained a ledger to account
                 for the drugs and proceeds.
        On October 6, 1989, the Police of Puerto Rico ("POPR") executed a
search warrant at Virgilio Dvila building 43, apartment 411.  
Reyes-Padilla was at the apartment with her parents.  The search
yielded twenty-six grams of cocaine and three grams of heroin
packaged in over 250 small bags.  Later, on October 17, 1989, the
POPR executed a search warrant at the same apartment.  When an
 officer first arrived, a young man was selling a controlled
substance through an iron grating on the apartment door.  When
   the officer identified himself, the man fled inside the
  apartment.  A search of the apartment yielded two grams of
 heroin, less than a gram of cocaine, and over $2000 in U.S.
                          currency.
        At trial, POPR officer Angel Nieves-Domnguez testified that,
pursuant to a tip, he conducted surveillance of Reyes-Padilla at
Virgilio Dvila building 43, apartment 412 during the afternoon
of October 1 and the morning of October 2, 1991.  On the first
day, he observed Reyes-Padilla and Santiago-Lugo retrieve two
large bags from the trunk of Santiago-Lugo's car.  Upon reaching
the stairs to building 43, Santiago-Lugo opened one of the brown
bags and pulled out several transparent plastic bags that each
contained smaller red bags.  As Santiago-Lugo distributed the
  plastic bags to the persons assembled, Reyes-Padilla made
  notations in a notebook.  Additionally, upon receiving the
packages, some recipients hid the packages in nearby garbage cans
or bushes.  Reyes-Padilla took the other large brown bag up to
                        apartment 412.
        After Santiago-Lugo left, the officer observed one individual --
 who had received a package from Santiago-Lugo -- apparently
  selling some of the smaller red bags to a young woman near
   building 44.  Shortly thereafter, a young man arrived at
apartment 412, and Reyes-Padilla sold the man a transparent bag
  appearing to contain heroin. The next day, the officer saw
Santiago-Lugo arrive and deliver yet another brown bag to Reyes-
                          Padilla.  
        Later that month, POPR executed a search warrant at apartment
412.  At that time, defendants Reyes-Padilla and Morales-Santiago
were in the apartment.  The search yielded four "decks" of heroin
in a Sucrets box, approximately $100,000 in U.S. currency, and
two notebooks appearing to contain records of drug deliveries and
                            debts.
        In November, POPR officers observed Rosado-Rosado and a minor
each engage in an apparent sale of controlled substances and give
the proceeds from the sale to a heavy-set individual.  Rosado-
Rosado retrieved the drugs from a brown paper bag in his back
pants pocket.  When officers entered the housing project, Rosado-
Rosado and the minor attempted to flee.  Officers caught Rosado-
 Rosado and seized eighteen aluminum foil packets containing
           heroin and five bags containing cocaine.
        Hidalgo testified at trial about the importance of the Virgilio
 Dvila punto as a drug distribution site.  He stated that he
personally received packages of cocaine and heroin from Morales-
Santiago to distribute on behalf of Israel Santiago-Lugo, and
that he observed distributors from Santiago-Lugo's other puntos
 arrive at Virgilio Dvila and receive packages from Morales-
Santiago.  He identified four pages of notebook entries under the
 name "Batman"  from the notebook seized in October 1991 that
  pertained to his distribution of marijuana and cocaine at
                      Virgilio Dvila.   
        Among the entries in the notebook was one pertaining to fifty
packets of heroin, referred to as "C" to correspond to "cristal,"
and one pertaining to fifty packets of cocaine, referred to as
"R" because of the brand name "bolso rojo."  Expert testimony
showed that the entries recorded transactions transpiring almost
  daily between October 29, 1990 and October 24, 1991.  The
notebooks contained a "price structure" table which specified the
prices of multiple units with a base price of $75 per unit.  A
conservative estimate of the amount of drugs distributed would be
close to 50,000 units having a total value of approximately $3.5
                       million dollars.
                   B.  The Rosario Brothers
        In 1993, Hidalgo learned that Santiago-Lugo and the Rosario
brothers had become adversaries.  Santiago-Lugo and the Rosarios
previously had agreed to share control of the drug distribution
punto at Virgilio Dvila in Bayamn.  According to Hidalgo, the
enmity between them stemmed from a drug debt owed to Santiago-
Lugo by one of the Rosarios.  Tensions escalated in early 1993
when a Santiago debt collector and a Rosario associate were both
                          murdered.
        In June 1993, Hidalgo sustained a gunshot wound when an unknown
assailant or assailants fired a barrage of bullets from a moving
vehicle near Virgilio Dvila.  After recuperating, Hidalgo again
rejoined the conspiracy.  On December 1, 1993, Hidalgo, Ortiz-
Bez, Santiago-Lugo, and co-conspirator Andrs Coln-Miranda were
arrested in Bayamn.  Ortiz-Bez, Hidalgo, and Coln-Miranda were
  in possession of firearms without proper permits.  Hidalgo
testified that they were armed due to the ongoing tensions with
                    the Rosario brothers.
C.  The Los Murales Punto
    Otero-Coln testified that, sometime in 1988 or 1989, Santiago-
Lugo's brother Ral and Jorge Martnez-Rosado ("Fobi") reached an
agreement with Jos Romn Freites ("Josean") for the distribution
of cristal heroin at Los Murales.  Otero-Coln, who had served as
a lookout for Josean for approximately two months, became a
runner who picked up drugs from Virgilio Dvila.  He testified
that he began picking up fifty packages, each containing ten
packets of heroin and costing $70.  Eventually, he would pick up
as many as 100 packages every three of four days, each costing
$75.
    Otero-Coln further testified that, after the POPR searched
Reyes-Padilla's Virgilio Dvila apartment, the distribution
operation was moved to the apartment of Morales-Santiago, who
also kept notebooks reflecting drug deliveries and debts.  He
stated that Ortiz-Bez and others who worked at the "table" in
Isla Verde were right-hand men for Santiago-Lugo.  These men
would sometimes transport drugs to Los Murales when Otero-Coln
could not.  When Reyes-Padilla was out of heroin, Santiago would
direct Otero-Coln to obtain it from another distribution group
and keep the profits.
    Hidalgo testified that he supervised cocaine and marijuana
distribution at the Los Murales housing project in 1991 and 1992,
and that during his tenure, all of the drugs distributed there
belonged to Santiago-Lugo.  He knew Otero-Coln as an individual
who would come to the Virgilio Dvila punto to obtain heroin for
Santiago-Lugo's punto at Los Murales.
D.  The Villa Evangelina Punto
    Otero-Coln identified defendant-appellant Eulalio Candelaria-
Silva as "Macho Gatillo," the overseer of the drug point at the
Villa Evangelina housing project.  Otero-Coln testified that he
met the Candelaria-Silvas, including Moiss and Luis, after
Josean agreed with Santiago-Lugo to distribute cocaine at Los
Murales in exchange for a reduction in the price of heroin
distributed there.  Otero-Coln stated that he would obtain
cocaine from Ral Santiago-Lugo at Virgilio Dvila and transport
the drugs to Eulalio and Moiss' house in Manat for processing
to sell at Los Murales and Villa Evangelina.  Eulalio Candelaria-
Silva would pick up the proceeds from Otero-Coln.  Moiss
assumed Eulalio's role after the latter was incarcerated.
    Otero-Coln testified that the Candelaria-Silvas began to
distribute "cristal" at Villa Evangelina.  On two occasions in
1990, an undercover police officer made controlled purchases of
cocaine from Eulalio Candelaria-Silva at Villa Evangelina.  In
addition, POPR officers executed search warrants at the
Candelaria home in 1993 and February 1995.  The 1993 search
yielded controlled substances including "cristal" heroin.
    In addition, the government introduced into evidence a letter
that had been seized from the residence of Israel Santiago-Lugo
in August 1993.  The letter was addressed from "Ral" to "Macho,"
and indicated that both of them were in jail at the same time.  
The letter appeared to discuss price negotiations, and refer to
members of the Candelaria family.
E.  The Enrique Catoni Punto
    Noem Garca-Otero testified that defendant-appellant Rosado-
Rosado was introduced to her as "Hormiguita," the supervisor of
heroin, cocaine, and marijuana sales at Enrique Catoni.  Ral
Santiago-Lugo introduced Ortiz-Bez as "Mickey Mouse."  On one
occasion, Raul Santiago-Lugo drove Ortiz-Bez to the Ramn-Sol
housing project in Arecibo and left him there to supervise.  On
another occasion, Ortiz-Bez and Rosado-Rosado recruited
individuals to distribute drugs at the housing project.  In
addition, Garca-Otero identified defendant-appellant Ral Ortiz-
Miranda as someone who would bring drugs to, and pick up money
from, the housing project on at least a weekly basis.  She
testified that she knew Ortiz-Miranda as "Cano Beeper."
DISCUSSION
I.  Jury Selection
         Defendant-appellants argue that the district court violated the
Fifth and Sixth Amendments, the Jury Selection and Service Act of
1968 ("the Act"), 28 U.S.C.  1861, Fed. R. Crim. P. 43(b), and
the Amended Plan for the Random Selection of Grand and Petit
Jurors for the United States District Court for Puerto Rico
("District Plan") by ex parte eliminating jurors from the venire.
    A.  The Jury Selection Act
    The Act was enacted to ensure that potential jurors are selected
at random from a representative cross-section of the community
and that all qualified citizens have an opportunity to be
considered for service.  See H.R. Rep. No. 1076 (1968), 1968 U.S.
C.C.A.N. 1792.  The Act provides that each district court devise
a "local plan" for the selection of jurors consistent with the
objectives of randomness and nondiscrimination set forth in  
1861 and 1862.  See  1863.  The local plan for the District of
Puerto Rico was devised and approved pursuant to  1863.
         The Act sets forth five specific reasons a summoned juror may be
excused by the district court.  They are:  (1) undue hardship;
(2) inability to render impartial service; (3) peremptory
challenge; (4) good cause shown; and (5) a determination by the
court that his service as a juror would be likely to threaten the
secrecy of the proceedings, or otherwise adversely affect the
integrity of the jury deliberations, that the exclusion is
warranted, and that the exclusion is not inconsistent with other
provisions of the Act.  See 28 U.S.C.  1866(c).  Section 1866(c)
provides that the court may only exclude a person under (5) in
open court.
         1.  Jury Orientation
    Of eighty prospective jurors in the panel for this case, only
sixty-two appeared for jury orientation on the morning of
September 13, 1995.  At the orientation, conducted on the record
but outside the presence of counsel, the district court gave
preliminary instructions regarding jury service and distributed
the juror questionnaires.  He told the jurors nothing specific
about the case except the docket number.  The judge then
instructed the jurors not to discuss the case with anyone, spoke
to them about the importance of jury service, and described the
questionnaire.  The judge left the courtroom while the jurors
viewed the video "Justice by the People" and completed the
questionnaires.  Upon their completion of the questionnaires, the
judge returned and excused the jurors for the day.  Because only
fifty prospective jurors remained after the morning orientation
session on September 13, the court summoned thirteen additional
randomly selected prospective jurors from two other panels.  
These prospective jurors, and one late-arriving member of the
original panel, then received substantially the same information
and instructions from the judge and completed the questionnaires.
        During jury selection the next day, it became clear to Ortiz-
Miranda's counsel that some of the juror questionnaires were
missing.  Upon raising the matter with the district court, the
judge explained to counsel that the clerk had "highlighted"
certain questionnaires as "problematic," and he had "dealt with
those obvious cases."  9/14/95 Tr. at 126.  Ortiz-Miranda's
counsel objected to the district court's actions on the ground
that it "involv[ed] and invok[ed] Fifth and Sixth Amendment
rights."  Id.  The court overruled counsel's objections, but
agreed to provide counsel with the questionnaire forms and
invited counsel to further object after reviewing them if counsel
found that the court had "exercised the [sic] improper
discretion," id., in excusing fourteen prospective jurors brought
to his attention by the jury clerk.
            a.  Lack of Qualifications Dismissals
        In order to be deemed qualified to serve as a juror on a petit
jury in the United States District Court for the District of
Puerto Rico, an individual must be a citizen of the United
States, eighteen years of age or older, have resided for a period
of one year within the judicial district, and be "able to read,
write, speak, and understand the English language with a degree
of proficiency sufficient to fill out satisfactorily the Juror
Qualification Form and to render satisfactory jury service in
this Court."  District Plan at 3.
        The district court dismissed six of the prospective jurors based
on a lack of proficiency in English.  Juror 16 stated that she
had difficulty reading or understanding English and answered the
question asking her to describe her work in general terms in
Spanish.  Juror 17 completed almost all of the questionnaire in
Spanish.  Juror 18 indicated that she had difficulty with English
and also wrote in Spanish that she did not hear well.  Juror 45
completed the forms entirely in Spanish.  Juror 61 indicated that
he had trouble with English and did not give more than a one word
response in English to any of the questions requiring more than a
yes or no answer.  Finally, Juror 93 indicated that he had
trouble reading or understanding English, but otherwise completed
the questionnaire in English.  After examining these
questionnaires, we hold that Judge Fust did not err by
dismissing these prospective jurors.
        The District Plan also mandates that "[n]o person shall be
qualified to serve . . . if he is incapable, by reason of mental
or physical infirmity, to render satisfactory jury service."  Id.
The district court excused two jurors for medical reasons.  Juror
13 answered "No" to the question, "Do you have any physical
problem (for example, sight, hearing or other medical condition)
that would interfere with your ability to serve?" but a note at
the bottom of the form states "Eye ongoing medical [illegible]."  
The government contends that this note was made by the district
court, but the author's identity is unclear.  The district court
did write on the beginning of the form:  "See note [page] 3
claimed ongoing eye impediment."  Juror 89 stated that he had
"Fibrilosis Atrial" and that he was currently taking daily
medication.  The district court excused him on account of his
health and because of his answer to question #9.  Question #9
asked the degree of education the prospective juror had achieved.  
Juror 89 had a law degree, but was retired.  Although the
district court's actions, with respect to these two jurors, were
questionable in that Juror 13 did not state that his medical
condition would interfere with his serving as a juror and Juror
89 was dismissed in part because he holds a law degree, there was
at least some medical reason why both jurors could have been
excused.  Accordingly, these excusals were not an abuse of
discretion.  See United States v. Contreras, 108 F.3d 1255, 1269
(10th Cir. 1997) (applying abuse of discretion standard to pre
voir dire excusals).
              b. Undue Hardship Dismissals
    Both  1866 and the District Plan permit the district court to
excuse prospective jurors prior to voir dire on the ground of
"undue hardship."  Here, the district court excused six jurors on
that basis.
    According to the district court's notes, Juror 3 was excused
because he was the only person at his office.  Juror 3 stated
that he "was the only representative of the company in Puerto
Rico.  I sell generic medicine to Drug [sic] stores and Hospitals
[sic] in P.R[.]  My Job [sic] is mostly done by telemarketing for
which I can not be away from my work for too long.  I m [sic]
training a part time employee to assist me due the [sic] increase
in sales."  The district court excused Juror 32 because she was
taking care of her mother, who was in the hospital, and her
grandmother, who was at home.  Although she was the "only one"
who could help them, she stated that she would "be very proud to
participate as a juror . . . and to let [her] know what [she]
should do."  According to his notes, Judge Fust excused Juror 70
because he was a night shift medical technician at Fajardo
Hospital.
    Jurors 35, 63, and 72 indicated that they had various business
and personal travel plans that would conflict with the trial.  
Juror 35 stated that she would be traveling during the trial to a
"Consumers Affairs annual meeting" and then "intend[ed] to take
my vacations."  Juror 63 was excused by the district court on
account of a pre-arranged vacation.  During the trial, she was
scheduled to attend a training session and to leave with her
family on a previously planned vacation.  Finally, Juror 72 was
excused because he had a reservation to go to Nevada and
California for a month during the trial.
    The district court did not abuse its discretion in dismissing
Jurors 3 and 32, but did impermissibly excuse Jurors 70, 35, 63,
and 72.  With regard to Jurors 3 and 32, their questionnaires
document that acting as Jurors would work an undue hardship.  
However, the same cannot be said for the others.   
    With regard to Juror 70, we note that under the District Plan, he
could have requested to be excused from jury duty.  The District
Plan states that jury service by medical laboratory technicians
would entail undue hardship or extreme inconvenience, and such an
individual "shall be excused from jury service upon individualrequest."  District Plan at 5 (emphasis added).  However, Juror
70 did not request to be excused or object to being a juror.  The
choice not to serve on the jury at this stage was his and not the
court's.  The district court acted improperly in unilaterally
excusing him from jury service.  We cannot be sure whether Juror
70 desired to serve or was unaware of the District Plan's
provision.  Regardless of his desire or knowledge, however, there
was no prima facie reason for him to have been dismissed from the
pool at this point.    
    We begin by noting with respect to Jurors 35, 63, and 72 that the
district court incorrectly described their situation to counsel
the next morning at jury selection.  The district court stated:  
"What else was there? And people with paid vacations, which they
so said in a note, Judge, I'm leaving on such and such a date.  
How can I detain those people?"  9/14/95 Tr. at 127.  After a
very close and careful reading of the questionnaires, we did not
find any notes on them stating that any of these jurors had paid
vacations.  If such a statement was made by any of the jurors to
the district court, it was not recorded by the Judge on the
questionnaires in the record.  Jurors 35 "intend[ed]" to take
vacations.  For Juror 63, "everything was set."  Finally, Juror
72 had a "reservation."  It appears that the district court
interpreted those phrases to mean paid non-refundable, non-
changeable tickets although those phrases may well not have meant
that at all.
    Jury duty works a burden on all called to serve.  There are
instances in which previously-made travel plans would cause jury
service to become an undue hardship.  However, the district court
all too willingly accepted the proposed excuses of these jurors
without allowing the parties to examine the prospective jurors in
voir dire. Exclusions at this stage approach a ministerial
function, which is why  1866 authorizes the clerk of the court
under the supervision of the district court -- if the District
Plan so authorizes -- to excuse such jurors. See  1866(c).  If
jurors are excused as a result of a non-ministerial exercise of
discretion better left to voir dire itself, as occurred here, the
prospects for the defendant obtaining a fair cross-section of the
community could be improperly diminished.
    In general, we think it unwise for district judges to engage in
ex parte voir dire beyond purely ministerial functions.  
Ministerial functions permitted by the Plan and Act are usually
performed by the clerk, under supervision of the court.  If a
judge does no more than what a jury clerk is authorized to do in
excusing  jurors, that may raise an issue of allocation of court
resources but does not raise an issue of impropriety.  See United
States v. Calaway, 524 F.2d 609, 619 (9th Cir. 1975).  When the
court, in the absence of counsel, starts questioning jurors and
excusing them based on responses which go beyond basic
information about qualifications, obvious bias, or hardship, it
is all too easy to slip over the line, as happened here.  Whether
slipping over the line deprives a defendant of statutory or
constitutional rights is another question.
         2.  The Remedy
    Having established that certain of the exclusions were not
justified under the Act, we turn to the question of whether the
Act provides appellants with a remedy.  By its terms, the Act
only provides a remedy -- the stay of proceedings pending the
selection of a petit jury in conformity with the Act -- for
substantial failures to comply with its provisions.  See  
1867(d); United States v. Calabrese, 942 F.2d 218, 226 (3d Cir.
1991).  In order to obtain this remedy, a party challenging the
jury selection process under the Act must make his challenge
"before the voir dire examination begins, or within seven days
after the defendant discovered or could have discovered, by the
exercise of diligence, the grounds therefor, whichever is
earlier."   1867(a).  The timeliness requirement "is to be
strictly construed, and failure to comply precisely with its
terms forecloses a challenge under the Act."  United States v.
Paradies, 98 F.3d 1266, 1277 (11th Cir. 1996) (citation omitted).  
"[O]nce voir dire begins, Jury Selection Act challenges are
barred, even where the grounds for the challenge are discovered
only later."  Id. at 1278 (emphasis added) (citations omitted).  
The Act requires that any motion filed be accompanied by a "sworn
statement of facts which, if true, would constitute a substantial
failure to comply with provisions of [the Act]."   1867(d).  
When that requirement is not satisfied, the challenge to the
selection process must fail, because "Congress left no room for
ad hoc review of the usefulness of compliance with [the sworn
statement] requirement."  Paradies, 98 F.3d at 1278 (citation
omitted).
    Ortiz-Miranda's counsel objected after the district court gave
counsel the list of the remaining prospective jurors and his
instructions for making challenges.  She stated the reasons for
her objection and the district court took notice.  See 9/14/95
Tr. at 129.  Counsel next asked if the transcript was available.  
See id.  The court stated:  "The transcript is not available."  
Id.  Counsel next asked for a continuance, which was denied.  Seeid.  But, the district court told counsel that she "can examine
the forms" and that there would be "an accounting made by the
jury clerk," id. at 129-30, but that it would not be done "now,"
id. at 130, because there was "[n]o need to do that now."  Id.
    With a transcript of the above events, it would seem that there
would be no quarrel as to what occurred.  Unfortunately, that is
not the case.  In a Memorandum Order dated August 11, 1998, the
district court took issue with Ortiz-Miranda's brief, stating:
"Contrary to what is stated in the brief on appeal, counsel for
all defendants, as well as trial attorneys for the Department of
Justice, were given copies of [the original questionnaires of
those excused] before jury selection commenced in the case now on
appeal."  8/11/98 Memorandum Order at 1 (emphasis added).  He
continued: "The preparation of the photocopies and sets of
documents were turned over to counsel before jury selection was
supervised . . . and I made certain that all attorneys of record
received a set of the pertinent documents so that they could
meaningfully participate in the jury selection process."  Id. at
2.  We note that the parties do not agree with the court's
assertion that the materials in the case were turned over to them
in the above described fashion.  Both the defendant-appellants
and the government, relying on the transcript of the proceeding
and the materials in the record,  state that the materials were
turned over to the parties after the commencement of voir dire.
    Ortiz-Miranda states that the record does not disclose when the
questionnaires were actually provided to counsel.  The government
contends that the record suggests that "the questionnaires were
made available sometime after commencement of voir dire, but on
September 14, 1995," Government's Resp. to Ortiz-Miranda's Mot.
at 3 (based on a memorandum from the district court to the Clerk
of the Court and the Jury Administrator dated that day) or the
questionnaires were "filed under seal in the Clerk's Office on
September 19, 1995, the day after the presentation of evidence
began."  Id. (based on Doc. 655 which was signed by Judge Fust
on September 19, 1995).
    Under the Act, the challenge along with the signed affidavit must
be filed before the commencement of voir dire.  Obviously, this
was not possible here because the record establishes that jury
selection commenced before counsel had any opportunity to
discover that prospective jurors had been excused.  In any event,
we choose not to wrestle with the thorny question of whether the
district court's actions mitigated counsel's duty to comply with
the Act. Even if all had proceeded ideally, the district court's
erroneous exclusions did not constitute a "substantial failure"
to comply with the Act.  See  1867(d).
    Congress left the content of this term largely up to the courts.  
See 1968 U.S. C.C.A.N. at 1794 ("Your committee would leave the
definition of 'substantial' to the process of judicial
decision.").  In determining whether a violation is substantial,
"the alleged violations must be weighed against the underlying
principles of the Act."  United States v. Gregory, 730 F.2d 692,
699 (11th Cir. 1984).  These principles are:  (1) the random
selection of jurors; and (2) the determination of
disqualifications, excuses, exemptions, and exclusions on the
basis of objective criteria only.  See id.  The inquiry is as
follows:

         For wrongful exclusions, determining whether there has been a
         substantial violation has both quantitative and qualitative
         aspects.  Quantitatively, a substantial violation generally will
         not be found if the numbers of errors is small.  Qualitatively,
         the inquiry is whether there has been a frustration of the Act's
         underlying principle of exclusions on the basis of objective
         criteria only.

Calabrese, 942 F.2d at 227-28 (citation omitted).  Here, the
number of arguably wrongfully excluded jurors was very small.  
Further, the Act's principle of exclusions on the basis of
objective criteria was not frustrated.  In excusing the four
individuals, the district court did not engage in qualitatively
improper actions such as creating a "new category of exclusions,"
see id. at 228, or discriminating against a  class of persons.  
See id.  Second, the district court did not prevent the jury
panel from consisting of a fair cross-section of the community.  
See United States v. Bearden, 659 F.2d 590, 602 (5th Cir. 1981).  
His actions, though improper, did not constitute a substantial
failure to comply with the Act.
    B.  Other Claims
    Defendant-appellants also argue that their rights under the Fifth
Amendment, the Sixth Amendment, and Fed. R. Crim. P. 43 were
violated by the district court's ex parte actions.  To the extent
that the district court improperly dismissed four prospective
jurors, we conclude that the errors were harmless to the
defendants.  See id. at 1270 n.11 (stating that the error must be
sufficiently egregious to constitute a constitutional violation).

II.  The Macho Gatillo Alias
    Eulalio Candelaria-Silva argues that the district court abused
its discretion by refusing to strike his alias, "Macho Gatillo,"
from the Superseding Indictment.  He contends that the use of the
alias was inflammatory, demeaning and prejudicial.
    In denying the motion to strike, the district court stated that
"Macho Gatillo" served the purpose of a proper name for
identification purposes.  The record reflects that the POPR
officer who conducted two undercover drug purchases from
Candelaria-Silva in 1990 knew him only as "Macho Gatillo."  In
addition, co-conspirator witness Otero-Coln also identified the
defendant only by his street name.  Furthermore, another POPR
officer corroborated these mutually consistent identifications of
the defendant by testifying that the defendant was known as
"Macho."  All of this evidence was probative with respect to
identifying Eulalio Candelaria-Silva as the author of the letter
seized from Israel Santiago-Lugo's residence -- a letter signed
"Macho" that discussed the operations of a punto.
    It is true that the record reflects the existence of at least one
other individual who answered to the name "Macho."  For this
reason, the POPR undercover officer and Otero-Coln's use of the
"Gatillo" portion of the name, which translates as "trigger," was
probative to distinguish the defendant.
    Eulalio Candelaria-Silva's argument fails because the evidence of
his alias was relevant, and there was no prejudice.  See United
States v. Delpit, 94 F.3d 1134, 1146 (8th Cir. 1996) (noting that
the use of the name "Monster" was necessary to fully identify the
defendant); United States v. Persico, 621 F. Supp. 842, 860-61
(S.D.N.Y. 1985) (stating that aliases and nicknames are proper in
an indictment where they will be part of the government's proof
at trial).
III.  Co-Conspirator Testimony
    Moiss Candelaria-Silva argues that the district court should
have excluded the letter seized from the residence of Israel
Santiago-Lugo.  The court admitted this exhibit pursuant to Fed.
R. Evid. 801(d)(2)(E) which defines as non-hearsay a statement by
a party's co-conspirator made during and in furtherance of the
conspiracy.  We find Moiss Candelaria-Silva's argument without
merit.
    The district court conditionally admitted certain evidence
pursuant to Fed. R. Evid. 801(d)(2)(E) after making the requisite
findings pursuant to United States v. Ciampaglia, 628 F.2d 632,
638 (1st Cir. 1980).  Later, the court expressly found that the
letter met the "in furtherance of" requirement of 801(d)(2)(E).  
At the end of trial, the court made the requisite determination
for unconditional admission of the letter and other evidence.
    As grounds for exclusion at trial, Moiss Candelaria-Silva argued
that there existed a legitimate doubt as to whether Macho Gatillo
was a member of this charged conspiracy at the time he wrote the
letter.  He renews this argument on appeal.  
    Letters can fall within the co-conspirator exception to the
hearsay rule.  See United States v. Richardson, 14 F.3d 666, 668-
70 (1st Cir. 1994).  In this case, there is more than sufficient
evidence that the statements in the letter were made by a co-
conspirator during and in furtherance of the charged conspiracy.  
First, the seizure of the letter from Israel Santiago-Lugo's
residence and references in the letter to the recipient's brother
incline toward a finding that the addressee was Israel Santiago-
Lugo's brother, Ral.  Furthermore, the writer, "Macho Gatillo" -
- Eulalio Candelaria-Silva -- refers to the involvement of his
mother in the transactions discussed.  The 1993 seizure of
cristal heroin at the Candelaria-Silva residences occurred in the
presence of Eulalio Candelaria-Silva's mother and Moiss
Candelaria-Silva.  In addition, the testimony of Otero-Coln
about the Candelaria-Silvas' roles at Villa Evangelina, and the
content of the letter, particularly its reference to the specific
brand of heroin constitute strong evidence that the letter was
prepared by a co-conspirator during and in furtherance of the
charged conspiracy.  As this Court stated in United States v.
Drougas:
         The source of the placemats [on which a series of handwritten
         names and numbers appear], the circumstances surrounding their
         seizure, the fact that the information corresponded to other
         evidence of the participants in the conspiracy, and the extreme
         unlikelihood that such a list would be prepared by one not privy
         to the operation of the conspiracy provide a sufficient basis to
         infer that the writings pertained to the conspiracy alleged and
         were made in furtherance of that conspiracy.

748 F.2d 8, 26 (1st Cir. 1984).
    Here, as in Drougas, the extreme unlikelihood that such a letter
would be prepared by one not privy to the operation of the
"cristal" heroin conspiracy provides a sufficient basis to infer
that the letter pertained to the conspiracy alleged and that the
statements therein were made in furtherance of that conspiracy.  
See Drougas, 748 F.2d at 26.  In light of the overall evidence in
the case, the references to the specific brand of heroin and the
statements about price and quantity, the district court did not
clearly err by admitting the evidence.
IV.  Motion in Limine
    A.  Evidence of Prior Dispositions
    Ortiz-Bez, Reyes-Padilla, and Moiss Candelaria-Silva contend
that the district court erred in prohibiting them from presenting
evidence about the prior dispositions of certain local criminal
charges relating to conduct involved in the charged conspiracy.  
Specifically, the defendants argue that the court's decision
prohibited them from presenting a defense.  We agree with the
district court that the prior dispositions were not admissible.
    In deciding this issue, the district court explained that the
local prosecutions were not relevant to this prosecution because
possible explanations for the early dismissals included "lack of
evidence, unavailability of witnesses, sloppy presentation by the
state prosecutors, irresponsible legal determinations, and the
sort."  9/14/95 Order at 3.  Furthermore, the district court
rejected the defendants' arguments as "a disguised attempt to
argue a double jeopardy defense before the jury."  Id. at 4.  The
district court's order was proper and in accordance with this
Court's recent decision in United States v. Smith, 145 F.3d 458,
461 (1st Cir. 1998), holding that an acquittal instruction is not
required when evidence of acquitted conduct is introduced.
    In Smith, a defendant, indicted for a drug offense and a tax
offense, was acquitted of the drug offense after a trial on that
charge alone.  During the subsequent trial on the tax offense,
the government presented evidence of drug trafficking to
demonstrate receipt of income that was not reported to the IRS.  
On appeal, the defendant argued that the trial court erred in
refusing to inform the jury of his acquittal on the drug charge
and in barring his cross-examination of prosecution witnesses on
their knowledge of that acquittal.  The defendant in Smith, like
the defendants in this case, relied on language in the Supreme
Court's decision in Dowling v. United States, 493 U.S. 342
(1990), to support this position.  In Dowling, the trial court
instructed the jury that the defendant had been acquitted of
robbing a witness and the witness's testimony was admitted for a
limited purpose.  As we noted when rejecting the defendant's
argument in Smith, however, "the sentence in Dowling that begins,
'Especially in light of the limiting instructions' does not
identify the language to which 'limiting instruction' refers."  
Smith, 145 F.3d at 461.  Furthermore, since an instruction was
given in Dowling, the Supreme Court did not decide the exclusion
issue.  See Smith 145 F.3d at 461.
    The reasons supporting exclusion of evidence about the dismissal
of a prior prosecution are even stronger than those that support
exclusion with respect to a prior acquittal.  As the district
court noted, cases are dismissed for many reasons unrelated to
the defendant's guilt.  The introduction of evidence of a
dismissal could well mislead the jury into thinking that a
defendant was innocent of the dismissed charge when no such
determination has been made.
    B.  Certificate of Good Conduct
    Moiss Candelaria-Silva argues that, under Fed. R. Evid. 405, the
trial court should have admitted a "certificate of good conduct."  
See Defendant's Br. at 23-30.  The district court, describing the
certificate as a "negative criminal record" certified by the
Puerto Rico Police, excluded the document. We hold that the
certificate of good conduct is not admissible character evidence.
    In United States v. DeJongh, 937 F.2d 1 (1st Cir. 1991), the
district court declined to admit what this Court described as a
"Good Conduct Certificate."  This Court upheld exclusion on the
ground of insufficient authentication.
    Furthermore, the certificate of good conduct does not satisfy
Fed. R. Evid. 405, which allows proof of character:  (1) by
"specific instances of conduct," id., on cross-examination or
where "character or a trait of character . . . is an essential
element of a charge, claim, or defense," id.; or (2) by
"testimony as to reputation or . . . in the form of an opinion."  
Id. Here, Candelaria-Silva cannot allege that the proffered
certificate of good conduct meets either of these requirements.
V.  Judicial Bias
    Defendant Moiss Candelaria-Silva contends that the trial court
exhibited judicial bias when it: (1) ruled on numerous
evidentiary issues during trial; and (2) chastised counsel in
front of the jury.  See Defendant's Br. at 35-40.  On review,
this Court considers "isolated incidents in light of the entire
transcript so as to guard against magnification on appeal of
instances which were of little importance in their setting."  
United States v. Montas, 41 F.3d 775, 779 (1st Cir. 1994)
(internal quotation marks and citations omitted).  Furthermore,
this Court must "differentiate between expressions of impatience,
annoyance or ire, on the one hand, and bias or partiality, on the
other hand."  Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997).  
On several occasions, this Court has held that a trial judge's
frustration displayed at sidebar does not deprive a defendant of
a fair trial.  See, e.g., United States v. Polito, 856 F.2d 414,
417-19 (1st Cir. 1988) (no bias where, at sidebar, judge warns
defense counsel that he is being reported to the State Bar
Association for violating rules of professional conduct); Dearyv. City of Gloucester, 9 F.3d 191, 194-96 (1st Cir. 1993) (no
bias where, at sidebar, the trial judge told defense counsel his
cross-examination of a witness was "very devious").  Here, Moiss
Candelaria-Silva has failed: (1) to demonstrate that the trial
court's actions rise to the level of bias; and (2) to meet his
burden of demonstrating serious prejudice.
     Moiss Candelaria-Silva complains that a number of evidentiary
rulings show bias.  We have examined those rulings and find they
were all proper in the exercise of the court's discretion.
Accordingly, Moiss Candelaria-Silva does not demonstrate
judicial bias with his complaints concerning: (1) the use of the
charts prepared by the government; (2) the display of photographs
of firearms, ammunition and drugs to the jury; (3) the admission
of testimony of an expert witness to explain the drug ledgers;
(4) the exclusion of evidence of prior acquittals; (5) the
exclusion of defense impeachment evidence concerning past
instances of untruthfulness; (6) the exclusion of a utility bill
to establish Moiss Candelaria-Silva's place of residence as
different from his mother's house; (7) the district court's
application of Fed. R. Evid. 801(d)(2)(E); (8) its admission of
evidence of allegedly unrelated murders and misconduct by
defendants; or (9) its alleged approval of the government's use
of leading questions.
    Similarly, Moiss Candelaria-Silva's complaint about the trial
court's "facial expressions,"  Defendant's Br. at 37, falls short
of the mark.  The transcript indicates that after an extensive
discussion among all defense counsel, at least two defense
counsel indicated that the district judge did not cover his mouth
or make faces when weapons were introduced into evidence.  See10/27/95 Tr. at 1861.  Perhaps one defense counsel accurately
summed up the situation when he remarked:  "I would also say for
the record, I have been able to perceive a very high tension
among all counsel.  And that every small incident, in my opinion,
is blown out of proportion."  Id. at 1883-84.
    Assuming arguendo that the trial court exhibited frustration from
time to time during this rather lengthy, heated trial, the strong
instructions given by the trial court during and at the end of
the trial should have eliminated any conceivable prejudice.  For
example, shortly after the bench conference regarding facial
expressions, the district court instructed the jury:   
         Remember also what I told you at the beginning, when we started
         the first day when I impaneled you.  Nothing that the court may
         say or do during the course of this trial is intended to indicate
         nor should be taken by you as indicating what your verdict should
         be.  Also, as you have perceived, throughout this trial, trial
         practice is very demanding of judges and attorneys and sometimes
         there exists at a given trial colloquy between the court and
         counsel.  This colloquy sometimes is easy going and sometimes I,
         as a judge, have to take a stand to keep proceedings returning in
         an orderly way.  It is very important for all of you to
         understand that any colloquy between court and counsel is not to
         be considered by you in determining the issues of this case.

Id.  at 1995.  Such jury instructions are an appropriate means to
"allay[] potential prejudice."  Logue, 103 F.3d at 1046-47
(citation omitted).
    Thus, Moiss Candelaria-Silva has failed to meet his burden of
showing serious prejudice.

VI.  Rule 16
    Ortiz-Miranda argues that the district court should have
suppressed Garca-Otero's identification testimony as the fruit
of a Rule 16 discovery violation.  Although Ortiz-Miranda argued
for suppression of the identification on the merits in the
district court, see 11/16/95 Tr. at 3449-52, 3479-82, he never
sought suppression as a discovery sanction.  Therefore, this
argument is waived.  See United States v. Barnett, 989 F.2d 546,
554 (1st Cir. 1993) ("Issues not squarely raised in the district
court will not be entertained on appeal.").
VII.  Jury Instructions
    Ortiz-Miranda argues that the evidence at trial mandated an
instruction explaining the particular concerns attendant to
eyewitness identification and explicitly stating that a guilty
verdict required a finding of identity beyond a reasonable doubt.  
See Defendant's Br. at 46. However, we have expressly "declined
to adopt . . . a rule of per se reversal [for such an error],
choosing not to constrain district courts with yet another
mandatory requirement."  United States v. Angiulo, 897 F.2d 1169,
1206 n.20 (1st Cir.) (citing United States v. Kavanaugh, 572 F.2d
9, 13 (1st Cir. 1978)), cert. denied, 498 U.S. 845 (1990).  
    Contrary to Ortiz Miranda's assertion, he was not entitled to a
particular instruction on the facts of this case.  As this Court
further stated in Angiulo:
         [T]he refusal to give a particular requested instruction,
         however, is reversible error only if the instruction (1) is
         substantively correct;  (2) was not substantially covered in the
         charge actually delivered to the jury; and (3) concerns an
         important point in the trial so that the failure to give it
         seriously impaired the defendant's ability to effectively present
         a given defense.

897 F.2d at 1205 (internal quotation marks and citations
omitted).
    Here, Ortiz-Miranda has not satisfied the second and third prongs
of the Angiulo test. First, the district court's charge
substantially covered the identification issue:
         Let's now discuss the subject of how is it that you gauge or
         assess the credibility of witnesses . . . . In making that
         decision, you may take into account a number of factors,
         including the following:

         One, was the witness able to see or hear or know the things about
         which that witness testified?  

         Two, what kind of opportunity did the witness have to observe
         facts or identify people, including the accused?

         Three, how well was the witness able to recall and describe those
         things or persons observed?

         Four, how positive was the witness' recollection of facts and the
         identification of people, including those accused?

         Five, what was the witness' manner while testifying?  By
         "manner," I mean appearance, demeanor.

         Six, . . . was the witness ever confused as to facts or the
         identification of persons, or did he or she misidentify or fail
         to identify a person or the accused on prior occasions?

12/1/95 Tr. at 4554-55 (emphasis added).
    Second, Garca-Otero testified twice at trial, and thus Ortiz-
Miranda had ample opportunity to develop the identification
defense during cross-examination, the presentation of defense
evidence, and closing argument.  Since the court's jury
instructions addressed the identification issue three times,
Ortiz-Miranda's "ability to effectively present" the
identification defense was not "seriously impaired."  Angiulo  
897 F.2d at 1205-06.
VIII.  Failure to Disclose and Newly-Discovered Evidence  
    Ortiz-Miranda argues that the government's failure to disclose
during trial its knowledge of Rivera-Melndez's whereabouts, his
possession of a green motorcycle, his involvement in certain
criminal activity, and his association with the alias "Cano
Beeper" in POPR records, constituted a due process violation
warranting reversal pursuant to Brady v. Maryland, 373 U.S. 83
(1972), and Kyles v. Whitley, 514 U.S. 419 (1995).  Ortiz-Miranda
also argues that newly discovered evidence from a witness who
began cooperating after conclusion of the trial independently and
cumulatively mandates a new trial.  Ortiz-Miranda's claims fail
because, as the district court correctly concluded, there is no
"reasonable probability" that disclosure of the Brady material
during trial would have resulted in Ortiz-Miranda's acquittal.  
See  Gilday v. Callahan, 59 F.3d 257, 267 (1st Cir. 1995), cert.
denied, 516 U.S. 1175 (1996).  Nor, as the district court
concluded, does the combination of the Brady material and newly-
discovered evidence create such a "reasonable probability."
    Ortiz-Miranda's motion for a new trial does not specifically cite
the failure to disclose Rivera-Melndez's location as grounds for
relief.  Rather, his counsel placed this information in an
"Affirmation" appended to the motion. Thus, although the district
court heard evidence on this issue at the hearing, it did not
specifically consider it in the Brady analysis.  The draft search
warrant affidavit did not contain information about the sighting
of Rivera-Melndez because that event did not occur until after
the prosecutor had declined to authorize Rivera-Melndez's
arrest.  In its analysis of the draft affidavit, however, the
district court assumed the availability of Rivera-Melndez and
determined that such availability would not have created a
reasonable probability of Ortiz-Miranda's acquittal.  First, the
court found it improbable that Rivera-Melndez would exculpate
Ortiz-Miranda by implicating himself.  See United States v.
Ortiz-Miranda, 931 F. Supp. 85, 93 (D.P.R. 1996).  Furthermore,
the court found it improbable that Garca-Otero would recant her
identification of Ortiz-Miranda or her failure to identify
Rivera-Melndez even if the defense produced Rivera-Melndez.  
See id.
    Ortiz-Miranda does not elaborate on how Rivera-Melndez's "very
presence in court," Defendant's Br. at 35-36, would otherwise
have created a reasonable probability of acquittal.  Such a claim
is especially questionable because the jury already had the
benefit of comparing photographs of the two men when assessing
the accuracy of Garca-Otero's identification of Ortiz-Miranda.  
The government, while conceding the possibility that Rivera-
Melndez could also be involved with Israel Santiago-Lugo's
organization, reasonably argued in closing arguments that the
testimony of Garca-Otero and other evidence nonetheless
established the guilt of Ortiz-Miranda.
    With respect to the draft probable cause affidavit itself, the
district court determined that it "favor[ed]" the
misidentification claim insofar as it did not contradict the
Department of Transportation information about the green
motorcycle and suggested Rivera-Melndez's involvement in drug
trafficking.  It did not, however, exculpate Ortiz-Miranda.  SeeOrtiz-Miranda, 931 F. Supp. at 92-93.  Similarly, the district
court correctly recognized that although the missing page of the
criminal history report would have "favored" the defense by
attributing the alias "Cano Beeper" solely to Rivera-Melndez,
the government perhaps could have established that the POPR
database was incomplete. See id. at 93.
    As the district court recognized, it is the "reasonable
probability" standard that distinguishes merely "favorable"
evidence from "material" evidence, the intentional or
unintentional withholding of which violates a defendant's due
process rights.  See Gilday, 59 F.3d at 267.  On this record, we
agree with the district court that "the sum of evidence withheld
is hardly of the variety that would undermine our confidence in
the outcome of the trial."  Ortiz-Miranda, 931 F. Supp. at 94.
    Finally, Ortiz-Miranda summarily asserts "prosecutorial
misconduct" as grounds for reversal.  In view of the fact that he
neither develops this argument nor cites any supporting
authority, we reject this argument out of hand.  See United
States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant
has an obligation to spell out its arguments squarely or
distinctly, or else forever hold its peace.").
IX.  Sufficiency of the Evidence
    First, with respect to Count 46, conspiracy to possess cocaine
and other controlled substances with the intent to distribute,
Moiss Candelaria-Silva argues that the evidence was insufficient
because the POPR investigation that led to the seizure did not
link him to the Sabana Seca residence where the seizure occurred.  
This claim fails because to obtain a conviction, the
investigative officers need not identify all the perpetrators
prior to arrest.  Here, the testimony of Otero-Coln about the
Candelaria-Silva family's use of the Sabana Seca residences to
process cocaine and other drugs for distribution well supported
the jury's verdict as to his involvement in the conduct charged
in Count 46.
    Second, Rosado-Rosado and Moiss Candelaria-Silva argue that the
evidence established the existence of separate conspiracies.  We
find their argument to be without merit.
    The evidence presented at trial established that there was an
overarching conspiracy headed by Israel Santiago-Lugo to
distribute controlled substances, including heroin, cocaine, and
marijuana.  The drugs were distributed at various places and by
various people, including members of the Candelaria family.  As
noted in United States v. Wihbey, "[t]he question whether a given
body of evidence is indicative of a single conspiracy, multiple
conspiracies, or no conspiracy at all is ordinarily a matter of
fact; a jury's determination in that regard is subject to review
only for evidentiary sufficiency."  75 F.3d 761, 774 (1st Cir.
1996) (citing United States v. David, 940 F.2d 722, 732 (1st
Cir.), cert. denied, 502 U.S. 989 (1991)).
    Here the trial court expressly charged the jury on the multiple
conspiracy defense:
         You must decide whether the conspiracy charged in the indictment
         existed and, if it did, who at least some of its members were.  
         If you find that the conspiracy charged did not exist, then you
         must return a not guilty verdict, even though you may find that
         some other conspiracy existed.  Similarly, if you find that any
         defendant was not a member of the charged conspiracy, then you
         must find that defendant not guilty, even though that defendant
         may have been a member of some other conspiracy.

12/1/95 Tr. at 4569-70.  Thus, the jury verdict can be viewed as
a rejection of the multiple conspiracy claim.  Wihbey, 75 F.3d at
775 n.8 (stating that when the district court gives a multiple
conspiracy instruction, a guilty verdict "can be seen as an
effective rejection of the multiple conspiracy theory").  
    As noted in United States v. Twitty, 72 F.3d 228 (1st Cir. 1995),
the arguments made by the defendant-appellants are not uncommon:
         Twitty's argument is a common one in conspiracy appeals.  
         Whenever a conspiracy involves successive transactions and
         multiple players, it is usually possible to slice the enterprise
         into discrete portions.  Even a single conspiracy is likely to
         involve subsidiary agreements relating to different individuals
         and transactions.  And more often than not, none of the
         agreements is explicit;  agreement is inferred from conduct;  and
         the conceptual tests used to distinguish between one conspiracy
         and many are not sharp edged.  See, e.g., United States v.
         Drougas, 748 F.2d 8, 17 (1st Cir.1984).

Id. at 231 (emphasis supplied).
    In Wihbey, this Court, quoting United States v. Glenn, 828 F.2d
855, 858 (1st Cir. 1987), set forth the framework for analyzing a
claim that the evidence was insufficient to allow the jury to
find a single conspiracy and that, instead, the evidence showed
two separate conspiracies:

         (1) Is the evidence sufficient to permit a jury to find the
         (express or tacit) agreement that the indictment charges?  (2) If
         not, is it sufficient to permit a jury, under a proper set of
         instructions, to convict the defendant of a related, similar
         conspiracy?  (3) If so [i.e., the answer to (2) is yes], does the
         variance affect the defendant's substantial rights or does the
         difference between the charged conspiracy and the conspiracy
         proved amount to "harmless error?"

75 F.3d at 773.  "Put differently, so long as the statutory
violation remains the same, the jury can convict even if the
facts are somewhat different than charged -- so long as the
difference does not cause unfair prejudice."  Id. (internal
quotation marks and citation omitted).
    Analyzing this case under the first prong of the Glenn test, the
evidence is clearly sufficient to permit a jury to find that
appellants Rosado-Rosado and Moiss Candelaria-Silva joined the
overarching conspiracy charged in Count I.  Assuming arguendo, as
in Wihbey, that there was insufficient proof that appellants
Rosado-Rosado and Moiss Candelaria-Silva were members of the
overarching conspiracy alleged in Count I, still, the second
prong of the Glenn test would be answered in the affirmative.  
For example, Moiss Candelaria-Silva largely concedes that the
evidence was sufficient to convict him of the statutory offense
charged in Count I -- engaging in a conspiracy in violation of 21
U.S.C. 846.  Likewise, appellant Rosado-Rosado states:  "It is
the contention of . . . appellant that the overt acts for which
evidence was presented against him relate -- if at all [--] to
separate and distinct drug operation or conspiracy."  Defendant's
Br. at 8. Regardless of this assertion, however, both Otero-Coln
and Garca-Otero testified as to their involvement in a
conspiracy with him.
    Since the second prong of the Glenn test is answered in the
affirmative, to obtain a reversal, appellants must meet their
burden under the third prong of the Glenn test -- that as a
result of the variance, they were unfairly prejudiced.  SeeWihbey, 75 F.3d at 773.  In Wihbey, the Court noted that there
were at least three ways in which such a variance might prejudice
the accused.  First, a defendant may receive inadequate notice of
the charge against him and thus is taken by surprise at trial.  
Second, a defendant may be twice subject to prosecution for the
same offense.  Third, a defendant may be prejudiced by
"evidentiary spillover"--the "transference of guilt" to a
defendant involved in one conspiracy from evidence incriminating
defendants in another conspiracy in which the particular
defendant was not involved.  See id. at 774.
    Like the appellants in Wihbey, the appellants here have failed to
carry their burden of establishing unfair prejudice.  Appellants
have clearly failed to establish the applicable test with respect
to a claim of prejudicial spillover -- "prejudice so pervasive
that a miscarriage of justice looms."  Id. at 776 (internal
quotation marks and citation omitted).  Here, the jury clearly
assessed the evidence against each defendant separately.  This is
demonstrated by the fact that the jury declined to reach any
verdict as to defendant Andrades-Marrero.  See 12/13/95 Tr. at
5093.  Thus, appellants have not established unfair prejudice.
    Accordingly, defendant-appellant's "multiple conspiracy" argument
is rejected.
X.  Factual Findings at Sentencing
    A.  Ortiz-Miranda
    In challenging his sentence, Ortiz-Miranda argues that the
district court erroneously attributed 1.5 kilograms of cocaine
base to him based upon extrapolating from an "average" dosage
amount.  Upon review, we conclude that the record supports the
district court's determination.
    The district court properly considered testimony concerning at
least ten total cocaine base deliveries directly involving Ortiz-
Miranda at the puntos in Arecibo and Vega Baja.  This estimate
was based upon the trial testimony of Garca-Otero and testimony
at the hearing on the motion for a new trial.  In addition,
Ortiz-Miranda had been arrested at the Arecibo location with
approximately 596 capsules of cocaine base in July 1994, and
Ortiz-Bez had been arrested near there in 1995 with over 1200
capsules containing a total amount of 196 grams of cocaine base.   
    Garca-Otero testified that at least 500 capsules of cocaine base
were distributed on a weekly basis in Vega Baja, and that Ortiz-
Miranda made approximately six deliveries.  Thus, a conservative
estimate of Ortiz-Miranda's direct involvement with 6,000
capsules at the two locations would yield one kilogram of cocaine
base and a higher weight of the total mixture containing it, the
capsules.  See  USCG  2D1.1(c)*(A) ("weight of a controlled
substance . . . refers to the weight of any mixture or substance
containing [it]").  In addition, the district court could
reasonably infer that the additional deliveries of at least 3,000
capsules, yielding approximately another one-half kilogram of
cocaine base to the Arecibo location would have been reasonably
foreseeable to Ortiz-Miranda as part of the conspiracy.  Here,
even using a conservative estimate, the district court properly
attributed 1.5 kilograms of cocaine base to Ortiz-Miranda.
    B.  Eulalio Candelaria-Silva
    Eulalio Candelaria-Silva argues that, because the firearms seized
from the Sabana Seca buildings were "out of reach," not used, and
not definitively linked to him, the district court erred in
imposing the two-level increase to his guidelines offense level
pursuant to USCG  2D1.1(b)(1).  However, at sentencing,
Candelaria failed to challenge the link between himself and the
firearms.  As a result, we reject his claim.  See Barnett, 989
F.2d at 554 ("raise-or-waive" rule not relaxed where evidence
supports sentencing findings).
    At sentencing, the district court correctly rejected Candelaria's
claim that a relationship between the drugs and the firearms was
"clearly improbable."  4/19/96 Tr. at 12.  Specifically, the
district court determined that "in the context of the evidence .
. . there [was] no doubt . . . that the weapons . . . had a
definite, clear connection with drug trafficking."  Id. at 13-14.  
The court stated further:
         [T]hese were not hunting weapons.  These were not a collection of
         weapons.  This was not a weapon had, like many people do, to just
         defend their home in the event some burglar comes in . . .These
         were loaded AK-47s and Ar-15s, we're talking about assault
         rifles.

Id.  After reviewing the record, we uphold the district court's
determination.
    C.  Ortiz-Bez
    At sentencing, Ortiz-Bez acknowledged his involvement as a core
member of the conspiracy.  Specifically, he acknowledged working
at the "table" in Isla Verde and going "out hunting for people to
kill them [during the drug war with the Rosarios]."  Defendant's
App. at 58.  In fact, his candor so impressed the judge that the
judge adjusted his offense level for acceptance of
responsibility.  See Ortiz-Bez Sentencing Findings at 2.
    Ortiz-Bez now maintains, however, that the sentence imposed was
"exaggeratedly harsh," and alleges that the government was
retaliatory in seeking a three-level, as opposed to two-level,
adjustment, pursuant to USCG  3B1.1(b), for his role in the
offense.  Contrary to his assertions, however, the record
reflects that, because Ortiz-Bez's relevant conduct clearly
involved five or more participants, he is not eligible for the
mere two-level adjustment pursuant to USCG  3B1.1(c).  Thus, the
district court did not clearly err.
    D.  Reyes-Padilla and Morales-Santiago

    Reyes-Padilla argues that the district court should have imposed
a lower sentence because of her age, medical condition and
rehabilitative efforts.  See Defendant's Br. at 10-11.  At
sentencing, however, she raised none of these claims, preferring
instead to argue that she had withdrawn from the conspiracy after
the 1989 execution of search warrants at her Virgilio Dvila
apartment.  See Defendant's App. at 66-79.  Notwithstanding this
waiver, age and health are not ordinarily relevant sentencing
factors, see USCG  5H1.1 & 5H1.4, and Reyes-Padilla makes no
argument that age and health in this case constitute a
"mitigating circumstance of a kind, or to a degree, not
adequately taken into consideration by the Sentencing
Commission." USCG  5K2.0.  Furthermore, her rehabilitation claim
is belied by the fact that, at sentencing, she refused to
acknowledge participation in the conspiracy after 1989.  SeeDefendant's App. at 71.  The record supports the sentence
imposed.
    Morales-Santiago also argues that the district court erred in
determining her relevant conduct, pursuant to USCG  2D1.1, and
in denying her an adjustment for acceptance of responsibility,
pursuant to USCG  3E1.1.  See Defendant's Br. at 7-8.  Although
Morales-Santiago has provided no transcript of the sentencing
proceedings, the available record supports the district court's
determination.  The record reflects that, during at least part of
the conspiracy, Morales-Santiago was charged with storing large
quantities of controlled substances, directly providing Israel
Santiago's distributors with those controlled substances,
collecting proceeds, and maintaining accounting records.  As
such, the expansiveness of the distribution conspiracy was
reasonably foreseeable to her even though she may not have
participated in every transaction.  Furthermore, contrary to
Morales-Santiago's assertions, the Presentence Report ("PSR") at
30-31 does reflect a "thorough explanation of her participation
in the case at hand" when viewed in the context of the trial
testimony of Hidalgo and Otero-Coln.  Thus, Morales-Santiago's
claim has no merit.
XI.  Forfeiture of the Montaez Property
    Reyes-Padilla makes six separate objections to the inclusion of
the Montaez Property in the Final Order of Forfeiture:  (1) that
there was no evidence that the property was traceable to drug
proceeds; (2) that she was denied the opportunity to have the
forfeiture determined by a jury; (3) that there was no principal
asset for which the Montaez property could properly be
substituted; (4) that forfeiture of the property constitutes
double jeopardy; (5) that the government waived its right to
forfeit the property as a substitute asset when it withdrew it
from Count 49; and (6) that her joint and several liability for
the full amount realized by the conspiracy violates the Excessive
Fines Clause of the Eighth Amendment.  None of Reyes-Padilla's
arguments is compelling.
    A.  Forfeiture of a Substitute Asset
    A criminal forfeiture order may take several forms.  First, the
government is entitled to an in personam judgment against the
defendant for the amount of money the defendant obtained as
proceeds of the offense.  Second, to the extent the government
can trace any of the proceeds to specific assets, it may seek the
forfeiture of those assets directly pursuant to 21 U.S.C.  
853(a)(1).  Third, if as a result of some act or omission of the
defendant, the government cannot trace the proceeds to specific
assets, it may seek the forfeiture of "any property, cash or
merchandise, in satisfaction of the amount of criminal forfeiture
to which it is entitled."  United States v. Voight, 89 F.3d 1050,
1088 (3d Cir. 1996); see 21 U.S.C.  853(p) (authorizing
forfeiture of substitute assets).
    In Voight, the Third Circuit held that a defendant convicted of
laundering $1.6 million was required to forfeit that amount as a
money judgment.  See 89 F.3d at 1084.  When the government could
not directly trace any forfeitable proceeds to the defendant's
current assets, the court held that the government could satisfy
the $1.6 million judgment by seeking forfeiture of the
defendant's assets as substitute assets.  See id. at 1088.
    Similarly, in this case, the district court ordered forfeiture of
the Montaez property as a substitute asset to satisfy, at least
in part, the $6,000,000 money judgment set forth in the
preliminary order of forfeiture because the government
established that it could not trace any of the criminal proceeds
into any of the defendant's current assets.
    In this context, failure to establish any nexus between the
MONTAEZ property and the conspiracy is irrelevant.  In fact,
such a nexus would render forfeiture of the property as a
substitute asset unnecessary.  See Voight, 89 F.3d at 1086
("[t]he substitute asset provision comes into play only when
forfeitable property cannot be identified as directly 'involved
in' or 'traceable to' [the criminal activity]").
    To obtain an order forfeiting property as a substitute asset, the
government need only comply with the requirements of    853(p).  
In particular, substitute assets may be forfeited if the
government shows that, as a result of any act or omission of the
defendant, the forfeitable property "(1) cannot be located upon
the exercise of due diligence; [or] (2) has been transferred or
sold to, or deposited with, a third party."   853(p)(1) & (2).  
    Here, the government complied with  853(p) by submitting a
motion and affidavit that recited the efforts the government had
made to locate the proceeds of the drug conspiracy that would
have been directly forfeitable under  853(a).  See Defendant's
App. at 121-24 (Affidavit of Special Agent Felicia Ramos-Andino).  
The affidavit concluded that Reyes-Padilla had "dissipated or
otherwise disposed of the proceeds of her drug trafficking," id.at 123, so that the proceeds could not, despite the exercise of
due diligence, be located.  See id. at 123-24.  Based on this
record, it was not error for the district court to order the
forfeiture of "other property of the defendant,"  853(p), up to
the amount described in the money judgment. See  853(p);  United
States v. Hurley, 63 F.3d 1, 23-24 (1st Cir. 1995) (affirming
forfeiture of substitute assets under identical provision in 18
U.S.C.  1963(m)).
    B.  Determination of Assets
    Reyes-Padilla contends that she was denied the right to have the
jury determine whether the Montaez Property could be forfeited.  
She also asserts that there was no "principal asset" for which
the Montaez Property could properly be substituted.  
    The forfeiture of substitute assets is a matter left solely to
the court.  See Hurley, 63 F.3d at 23 ("the statute says that an
order substituting assets is to be made by 'the court'").  As
this Court explained in Hurley, the defendant has a right to have
the amount subject to forfeiture determined, in the first
instance, by the jury.  See 68 F.3d at 23; see also Fed. R. Crim.
P. 31(e) (stating that the initial forfeiture is sought in the
indictment and is specified in a special verdict).  But the jury
has no role in determining, subsequently, whether the property
has been dissipated and whether the government is thereby
entitled to seek the forfeiture of substitute assets.  "Indeed,
the government might not even know that substitution is necessary
until it seeks to take possession of the property specified in
the initial forfeiture order."  Hurley, 68 F.3d at 23.
    In this case, the jury determined -- by rendering the special
verdict -- that the conspiracy realized $6,000,000 in proceeds
from the commission of the specified offenses, and that the
defendant and others were jointly and severally liable for that
amount.  Thus, the jury determined that the $6,000,000 was the
"principal asset" subject to forfeiture.  In having the jury
determine that amount, the defendant was afforded all of the
procedural protections regarding the determination of the
forfeiture by the jury to which she was entitled.
    C.  Double Jeopardy and Waiver
    There is no merit whatsoever in Reyes-Padilla's contention that
she was subject to double jeopardy because the government
commenced its case with a civil seizure, but concluded it by
proceeding under the substitute assets provision of the criminal
forfeiture statute.  Nor did the government's initial inclusion,
and subsequent dismissal, of the Montaez property from Counts 48
and 49 of the Superseding Indictment constitute a waiver of the
right to seek forfeiture of the property as a substitute asset.
    A completed civil forfeiture of property does not constitute
"jeopardy" under the Double Jeopardy Clause, and does not bar the
subsequent criminal prosecution and punishment of the defendant
whose property was forfeited.  See United States v. Ursery, 518
U.S. 267, 274 (1996) (stating that the Supreme Court has
consistently concluded that "the Clause does not apply to [civil
forfeitures] because they do not impose punishment").  A
fortiori, a civil forfeiture action that goes no further than a
seizure, and never results in the entry of any civil forfeiture
judgment cannot constitute jeopardy.  Moreover, this Court has
recognized that it is "perfectly proper" to begin a forfeiture
action with a civil seizure, and then to convert the action to a
criminal forfeiture once an indictment is returned.  See United
States v. Kingsley, 851 F.2d 16, 18 & n.1 (1st Cir. 1988).  
Indeed, that procedure is commonplace.
    Nor is it uncommon for the government to shift theories of
criminal forfeiture -- from direct forfeiture to substitute
assets -- upon return of an indictment.  We held in Voight that
when the government's attempt to forfeit the defendant's property
directly was unsuccessful, the remedy was for the government to
seek forfeiture of the same property as a substitute asset under  
853(p).  See Voight, 89 F.3d at 1088.  If, as Voightillustrates, it is proper to seek the forfeiture of property as a
substitute asset even after a jury has rejected the government's
attempt to forfeit the property directly, then there is no error
in allowing the government to dismiss the property from the
forfeiture allegation before it goes to the jury and to seek the
forfeiture as a substitute asset after trial.  In dismissing the
Montaez property from the forfeiture allegation in Count 49, the
government simply shifted its theory of forfeiture from  853(a)
to  853(p).  Doing so before submission of the case to the jury
was entirely proper in light of the prosecutor's conclusion that
there was insufficient evidence to support direct forfeiture
under  853(a).
    D.  Excessive Fines Clause  
    It is well-established that criminal defendants are jointly and
severally liable for forfeiture of the full amount of the
proceeds of their criminal offense, and that the imposition of
such a forfeiture judgment does not constitute an
unconstitutionally excessive fine.  See Hurley, 63 F.3d at 23
("the government can collect [the amount subject to forfeiture]
only once but, subject to that cap, it can collect from any
appellant so much of that amount as was foreseeable to that
appellant"); see also  United States v. Simmons, 154 F.3d 765,
769-70 (8th Cir. 1998) (holding that each defendant is jointly
and severally liable for all foreseeable proceeds of the scheme
and that "the government is not required to prove the specific
portion of proceeds for which each defendant is responsible").
    In Hurley, we affirmed precisely the action taken here: the
imposition of an order substituting other property of each
defendant up to the value of the criminal proceeds for which the
defendant was jointly and severally liable.  In that case, each
of the defendants, including the relatively minor participants,
was ordered to forfeit substitute assets up to approximately $140
million in value.  If holding each defendant jointly and
severally liable to forfeit that amount in substitute assets did
not violate the Excessive Fines Clause, then the forfeiture
imposed on Reyes-Padilla does not.   
    It is true, as Reyes-Padilla notes, that the Eighth Circuit has
held that holding a "secondary figure" jointly and severally
liable for the forfeiture of the full amount of the criminal
proceeds may constitute an excessive fine if the defendant
"reaped little benefit" from the scheme.  See United States v.
Van Brocklin, 115 F.3d 587, 602 (8th Cir. 1997).  Van Brocklindoes not aid the defendant.
    First, in Hurley, we upheld the imposition of a substitute assets
order for the full amount of the criminal proceeds against
relatively low-level participants who reaped little personal
benefit from the criminal offense.   
    Second, in its most recent opinion on the matter, the Eighth
Circuit relied on Hurley to uphold a forfeiture order holding the
defendants jointly and severally liable for the full amount of
the proceeds of a bribery offense, whether or not a given
defendant received those funds personally.  See Simmons, 154 F.3d  
at 769.
    Third, it is appropriate to hold Reyes-Padilla accountable.  
Although the district court determined that she was a minor
participant in the offense, she served as an important link
between Israel Santiago-Lugo and his distributors at the various
housing projects.  Because she personally received and stored
controlled substances at her apartment and at the apartment of
Morales-Santiago, personally provided wholesale quantities of
controlled substances to Santiago-Lugo's distributors, and also
assisted with maintaining records of these transactions, she is
appropriately characterized as being "in charge of Santiago
Lugo's drug trafficking business at the Virgilio Dvila Housing
Project in Bayamn."  Defendant's App. at 121 (Affidavit of
Special Agent Felicia Ramos-Andino). Reyes-Padilla was at
Morales-Santiago's apartment when POPR officers seized
approximately $96,000 in currency and the drug ledgers reflecting
over $3,000,000 worth of transactions during a one-year period.  
Given Reyes-Padilla's role, holding her liable for the full
amount of the proceeds of the conspiracy falls well within the
bounds we prescribed in Hurley.
    Finally, Reyes-Padilla does not challenge the $6,000,000 money
judgment.  Rather, her appeal challenges only the forfeiture of
the Montaez property as a substitute asset.  The Montaez
property has a value of only $169,000.  Reyes-Padilla cannot
seriously argue that the forfeiture of property valued at that
amount is "grossly disproportional" to the gravity of a drug
conspiracy that realized millions of dollars in proceeds.  See United States v. Bajakajian, 118 S. Ct. 2028, 2036 (1998)
(holding that "a punitive forfeiture violates the Excessive Fines
Clause if it is grossly disproportional to the gravity of a
defendant's offense").  Accordingly, the forfeiture of Reyes-
Padilla's Montaez property does not violate the Excessive Fines
Clause of the United States Constitution.
                          CONCLUSION
        For the reasons stated in this opinion, we AFFIRM.

</body>

</html>